KFOX, INC.

v.

The UNITED STATES.

No. 151–71.

United States Court of Claims.

Feb. 19, 1975.

M. Carr Ferguson, Jr., New York City, attorney of record for plaintiff. Charles T. Mederrick and Wachtell, Lipton, Rosen & Katz, New York City, of counsel.

Laurence J. Whalen, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant. Gilbert E. Andrews, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and SKELTON and BENNETT, Judges.

SKELTON, Judge.*

## OPINION

This case is a suit for a refund of income tax paid pursuant to a finding of tax deficiency by the Internal Revenue Service plus appropriate interest thereon. The period of time involved includes the fiscal year ending November 30, 1963, the taxable period December 1, 1963, through December 31, 1963, and the calendar years 1964, 1965, and 1966. The primary issue in the case deals with the

---

* We are indebted to Trial Judge George Willi for his opinion, which has been very helpful although, in part, we reach a different result, and for his findings of fact which, with some modifications, and to the extent necessary, have been incorporated in the body of this opinion.

proper allocation of the purchase price of an operating radio station among specific acquired assets.

The plaintiff, KFOX, Inc., formerly Illinois-California Broadcasting Company, Inc., was incorporated under Illinois laws for the purpose of acquiring and operating a Long Beach, California, radio station, KFOX and KFOX–FM (hereinafter referred to as the Old KFOX). Throughout most of its early years and before it was acquired by the plaintiff, Old KFOX operated under a general market format with a limited orientation towards black audiences. During this period the station recorded substantial losses of revenue aggregating over $200,-000. In 1957 the original KFOX management tried unsuccessfully to interest the Sonderling Broadcasting Corporation into purchasing the station; Sonderling Broadcasting whose shareholders incorporated the plaintiff was headed by Egmont Sonderling, principal officer of the plaintiff in this suit. When Sonderling expressed disinterest, KFOX and KFOX–FM were subsequently sold in December 1957 to the Bing Crosby enterprises. In early 1959 KFOX was again up for sale as the Crosby group attempted to convince James Blackburn and Company, a national brokerage concern dealing with the communications media, to list the station for sale at $900,000. Blackburn refused because it deemed the selling price to be excessive in view of KFOX's meager annual revenues of $250,000 and yearly operation at a deficit.

At about this time, KXLA, a Pasadena, California, radio station, was undergoing a change in management as well as format. KXLA was long the pioneer of Country and Western (hereinafter "C & W") programming in the Los Angeles area, operating profitably with a small but intensely loyal audience. The radio station's commercial success was due in large part to the popularity of its air personalities, three of whom included Carl (Deacon) Moore, Tom Brennan, and Charlie Williams. When these disc jockeys at KXLA became aware of the impending change of format to "rock and roll" music they began to look for an alternative radio station that could use their particular talents. Frank Simon, Sales Manager for KXLA, approached KFOX and attempted to interest it into switching over to a C & W programming format and taking on all three of KXLA's air personalities in addition to himself. Because a radio station's audience is more loyal to the particular disc jockey personality and station programming than to the station's call letters, Simon argued that a complete takeover of the three C & W radio entertainers would result in a total transplant to KFOX of KXLA's audience as well as the sponsors that the disc jockeys were personally able to attract. Due to KFOX's poor financial situation, the Crosby interests were receptive to the plan, hiring Moore, Williams, and Brennan, but, as a result of negotiation difficulties, not Simon.

The new disc jockeys and their C & W format proved to be a commercial success as KFOX's profitability steadily rose until the operating revenues had increased from $250,000 in 1959 to almost $500,000 in 1961. The Crosby interests, still wishing to sell KFOX for approximately $900,000, continued to remain in touch with Blackburn and Company as well as the plaintiff through Sonderling. Following receipt of an offer passed through Blackburn, Sonderling began to seriously consider the purchase of the station. Although at first Sonderling sought to acquire KFOX's stock and utilize the station's accumulated net operating losses for its tax advantage, this proved to be impossible and so Sonderling began to negotiate for a straight purchase of KFOX assets. A price of $1,000,000 was tentatively agreed to by both parties for such assets. As a result of adjustments made to account for certain liabilities and revenues assumed by the plaintiff, although not calculated until his actual control and ownership began, the ultimate cash purchase price was eventually set at $878,666.

As a condition to final agreement, Sonderling had two stipulations. First, he requested of the Old KFOX manage-

ment that the station manager, Murillo Schofield, and the four Country and Western air personalities (the three KXLA C & W announcers plus Biff Collie who was hired later) then comprising the heart of KFOX's format be required to sign individual personal service contracts, containing, among other matters, a covenant not to compete. Sonderling apparently felt that these five individuals played a critical part in KFOX's turnabout from running a deficit before 1961 to a profitable operation at the time of the sale. Second, he demanded a renegotiation of the lease of the AM transmitter site. Under the old lease which had 16 years to run, the station was charged a monthly rent of $250 for the first three years and $300 for the remaining life of the lease plus the excess of one percent of KFOX's operating revenues over those fixed amounts.

Sonderling's two demands were met by the Old KFOX management. On August 30, 1961, the four Country and Western performers not previously under contract were signed to two year service contracts, renewable once at the option of the station and subject to an anticompetition clause forbidding the talent from working within 100 miles of Long Beach. Schofield was similarly signed to a contract with KFOX. In addition to the contracts, the Old KFOX negotiated the transmitter site lease replacing the percentage of revenue provision of the original rental agreement with a flat $350 rental. The new lease contained one provision not included in the old one, a clause permitting the lessor to relocate the transmitter at his own expense to any acceptable site within a one mile radius.

Having met the stipulations, a firm sales contract was signed between the Old KFOX and plaintiff on September 21, 1961, contingent only on FCC approval of the transfer of KFOX's broadcasting license to the new owners. Due to the need for FCC approval, the plaintiff did not begin to assume control and operation of the KFOX stations until December 1, 1961.

Shortly after December 1961, Colin Selph, sales representative of Blackburn was asked by plaintiff to allocate the final purchase price of $878,666 among the various assets obtained from the Old KFOX stations. In a letter of January 11, 1962, Selph set forth the following suggested allocation:

| | |
|---|---:|
| Country and Western music artists contracts | $250,000.00 |
| Station Manager's Contract | 150,000.00 |
| Contracts with advertisers | 26,500.00 |
| Net current assets | 25,000.00 |
| Office supplies | 2,500.00 |
| Furniture fixtures and leasehold improvements—Studio and Transmitter sites | 43,500.00 |
| Radio Towers, Radio Transmitters, and associated equipment at transmitter site | 70,000.00 |
| Studio Equipment—AM and FM | 41,200.00 |
| FM Towers and related equipment at Studio site | 40,000.00 |
| Tools, tubes and other technical replacement parts and material | 4,000.00 |
| Record library | 30,000.00 |
| Commercial continuity files | 6,500.00 |
| Promotion material | 3,500.00 |
| Automobiles | 4,700.00 |
| Transmitter site lease | 50,000.00 |
| Studio and Office lease | 35,500.00 |
| Good will and licenses | 95,766.96 |
| | $878,666.96 |

The allocation of the purchase price as estimated by Selph of Blackburn and Company was adopted by plaintiff in its tax returns in question here as the tax basis for purposes of computing income tax deductions for depreciation of its tangible assets and amortization of its intangibles. On audit by the Internal Revenue Service certain portions of the basis values employed by the plaintiff for amortization and depreciation were deemed inappropriate and disallowed. Those assets whose values were questioned and adjusted are as follows:

| Asset | Tax Basis Per Return | Tax Basis As Adjusted by IRS |
|---|---:|---:|
| Station Manager's Contract | $150,000 | $40,909 |
| Performers' Contracts | 250,000 | 68,182 |
| Transmitter Site Lease | 50,000 | 2,540 |
| Studio and Office Lease | 35,500 | 6,000 |
| AM Towers and Transmitter | 70,000 | 15,050 |
| FM Towers and Equipment | 40,000 | 8,600 |
| Record Library | 30,000 | 15,000 |
| Goodwill and FCC License | 95,766 | 564,985 |

As may be noted from the table, the IRS increased the amount of the purchase

price allocated to goodwill and the FCC license by the same amount that it reduced the various tangible and intangible assets. Thus, while plaintiff claimed that only $95,766 or 10.9 percent of the total purchase price was paid for goodwill, the IRS determined that $564,985 or 64.4 percent had to be allocated to this non-depreciable asset.

As a result of the redetermination of the tax basis for each of the questioned assets, the IRS assessed the following deficiencies:

| Tax Period | Tax and Deficiency Interest |
|---|---|
| FY ending 11/30/63 | $94,762.25 |
| 12/1/63–12/31/63 | 8,291.05 |
| 1964 | 88,209.07 |
| 1965 | 53,093.46 |
| 1966 | 10,349.01 |
| | $254,704.84 |

These deficiencies were paid by the plaintiff and a claim for refund timely filed. When this claim was not acted upon by the IRS within six months, the plaintiff commenced an action in this court. The case was heard by our Trial Judges Willi and Fletcher and on February 19, 1974, an opinion was filed by Judge Willi upholding the reallocation of the purchase price as made by the IRS as to all assets but one, the trial judge increasing the value assigned by the defendant to the AM transmitter, i. e., raising the tax basis from the IRS's $15,050 to $18,300. This case is before us now under Rule 143 on plaintiff's exceptions to the trial judge's findings of fact and conclusions of law.

In both tax deficiency and tax refund cases, there is a strong presumption that the assessment of taxes owed as determined by the Commissioner of Internal Revenue is correct. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Stubbs, Overbeck & Assoc. v. United States, 445 F.2d 1142, 1148 (5th Cir. 1971); Young & Rubicam, Inc. v. United States, 410 F.2d 1233, 1244, 187 Ct.Cl. 635, 655 (1969); Commissioner v. Riss, 374 F.2d 161 (8th Cir. 1967). In order to overcome this presumption on appeal the burden is on the taxpayer to offer substantial evidence as to the wrongfulness of the Commissioner's determination. Commissioner v. Riss, *supra* at 166. Once the taxpayer has met this burden the presumption disappears and the court must resolve the question upon the basis of all of the evidence before it. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Stubbs, Overbeck & Assoc., *supra;* Commissioner v. Riss, *supra.* Thus the court in Commissioner v. Riss states:

> The presumption of correctness rule is usually dispositive of a case in situations where the taxpayer offers no substantial evidence to overcome the presumption created by the Commissioner's determination. However, when the taxpayer has offered substantial evidence to support his position, the presumption disappears. The fact issue must then be resolved by the Tax Court upon the basis of the evidence before it. * * * [374 F.2d at 166.]

Similarly, in *Stubbs, Overbeck & Assoc., supra,* the court noted:

> * * * [O]nce the presumption [of correctness] is overcome by the plaintiff's evidence, it disappears and is no longer in the case. When this occurs, the court is required to base its decision on the preponderance of all of the credible evidence in the case. * * * [445 F.2d at 1148.]

The question before us in this case is therefore whether the taxpayer has presented substantial evidence to overcome the presumption of regularity and correctness in the IRS's valuation of the plaintiff's assets for depreciation and amortization purposes. To the extent the plaintiff has met his burden of proof as to any asset improperly valued, the IRS's presumption of correctness falls away and we can place a value on the asset based on all of the evidence obtained at trial before our trial judge.

### Allocation by the Parties

The first contention made by the plaintiff is that the parties to the sale of

KFOX agreed to make a specific allocation of the purchase price among the various assets of the station. The plaintiff maintains that since the ultimate cash price of the station was not to be determined until after the FCC approved the transfer of the license at which time the various contemplated adjustments to the $1,000,000 price would be made, the agreed upon allocation was to be deferred until then. Because the allocation made by Blackburn and Company was allegedly pursuant to the agreement among the parties, the plaintiff argues that the IRS and this court should be bound by its terms and the plaintiff's resulting deductions therefore be accepted.

■ When two parties to the sale of assets explicitly allocate the aggregate purchase price to the various assets being sold, the valuation they put on each asset will usually be accepted for tax purposes so long as the parties have opposing tax positions and have acted without collusion of fraud and the allocation is not so disproportionate as to be unreasonable. Davee v. United States, 195 Ct.Cl. 184, 444 F.2d 557 (1971); Republic Steel Corp. v. United States, 94 Ct.Cl. 476, 40 F.Supp. 1017 (1941); Annabelle Candy Co. v. Commissioner, 314 F.2d 1 (9th Cir. 1962); Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959). To the extent, therefore, that the parties agreed to allocate and in fact did allocate the aggregate price over all of the assets we would be constrained to follow that allocation as the basis to be applied in depreciating those assets. In the instant case, however, based on the ambiguous and somewhat conflicting testimony given before the trial judge, we do not believe the plaintiff sustained the burden of proof necessary to overcome the IRS's determination that there was no mutual agreement to allocate the aggregate purchase price of KFOX and KFOX–FM.

As proof of its allegation that both parties agreed to make such an allocation, plaintiff points to the Bill of Sale which was attached to the Purchase

Agreement and designated Attachment A (Plaintiff's Exhibit 22), and which states:

It is mutually agreed that the total purchase price was decided by adding the agreed upon purchase price of the items or categories herein set forth * * *.

Following this is a listing of assets which directly match the assets appraised by Blackburn in January 1962, and which was used by the plaintiff in its tax returns. Although the Bill of Sale states that the aggregate purchase price was the sum total of the values placed on each of the assets, in fact the assets were not evaluated until January 1962, four months after the Sales Agreement was signed and one month after the sale was actually consummated. Beyond this, clause 2 of the Sales Agreement appears to contradict the Bill of Sale:

### PURCHASE PRICE

2. The purchase price of the property, assets and rights so acquired, to be paid by Buyer to Seller shall be one million dollars ($1,000,000), minus the unpaid balances as of the Closing Date on Items (a), (b) and (c) below:

\* \* \* \* \* \*

The adjustments to the lump sum contract price referred to in clauses 2(a), (b) and (c) represent certain assumed liabilities and revenues calculated at the closing date. While it cannot be said that the mere fact that an allocation was deferred implies that no agreement was present, *Annabelle Candy Co., supra,* 314 F.2d at 7, the fact that a lump sum price was clearly agreed upon long before an allocation was made would seem to indicate that the specific values of the individual assets were irrelevant to a consummated contract of sale. Based on the explicit language of the Sales Agreement and the attached Bill of Sale, it appears that no substantial evidence of an agreement to allocate was shown.

Nor does the testimony of Sonderling or Selph, the appraiser and now president of Blackburn and Company provide

the kind of evidence needed to counter the presumption in favor of the IRS's determination on this particular issue. Mr. Selph testified at one point as to how an allocation was agreed upon:

Q. Sometime after the agreement was executed, then, Mr. Selph, were you requested by the parties to prepare such an appraisal?

A. Yes, sir.

Q. You said it was typical for the seller to request such an appraisal.

Do you recall whether there was a joint request in this case?

A. I think there was a joint request, as I remember.

Q. Did either the buyer or the seller ask you to weight your appraisal in favor of certain assets?

A. No, they didn't, and we wouldn't have, if they had asked.

Q. What were your instructions in connection with the preparation of the appraisal?

A. To evaluate the assets that were being purchased. [Tr. at 307–08.]

However, in later testimony he stated:

Q. What interest do you think the seller might have in such allocation?

A. The seller wouldn't have much interest in these allocations from the standpoint of, you know, "The king is dead, long live the buyer."

* * * * * *

*I don't think they [the seller] were interested in getting any appraisal of assets.* [Emphasis supplied.] [Tr. at 347.]

Sonderling, plaintiff's president, similarly testified as to an alleged agreement to allocate the purchase price:

Q. Did you and Mr. Grillo agree to have a valuation of the various assets prepared by Mr. Blackburn for allocation of the purchase price?

A. Yes, upon request of accountants and at suggestion of counsel it was necessary to have a bill of sale setting forth the assets which we were buying and in order to make appropriate allocations, James Blackburn and Company was requested to make an appraisal.
[Tr. at 446.]

However, in response to questions by the trial judge, Sonderling casts doubt on whether the allocation was either made pursuant to an agreement or for the sake of setting an aggregate price as alleged:

THE COMMISSIONER: Now, this appraisal that you were going to have these people make was after you had struck your essential bargain and with the seller?

THE WITNESS: Yes, your Honor.

THE COMMISSIONER: The appraisal wasn't made for the purpose of putting a price on the overall transaction on which you all were going to trade?

THE WITNESS: No.
[Tr. at 447.]

■ In light of this contradictory testimony and the Bill of Sale as written, we do not feel that the plaintiff presented substantial evidence sufficient to overcome the presumption of correctness of the IRS's initial determination, and, therefore, we sustain both the trial judge and the IRS in their finding that the plaintiff had made no agreement with the seller to allocate the purchase price among KFOX's assets as correct. For this reason we hold that values assigned to the enumerated assets by Blackburn were made at the plaintiff's urging, not as part of the original agreement, and, therefore, are not dispositive of the issue of what tax basis should be assigned to each of the depreciated assets.

Despite the fact that we have found that the Blackburn appraisal is not binding *per se* on the IRS or this court, we must point out that such finding alone does not dispose of this case. Rather, we are now free to determine whether the plaintiff has presented substantial evidence showing the incorrectness of the IRS's valuation of each individual asset

and if it has made such a showing, we must decide, based on all of the evidence before us, what a correct tax basis of each item should be.

Those assets which were readjusted by the IRS and which remain at issue in this refund suit, once the allocation agreement is removed, include certain tangible assets, the transmitter site lease, the four C & W talent contracts, the station manager's contract and goodwill.

### Tangle Assets

The tangible assets which were reevaluated are:

| Asset | Tax Basis Per Return | Readjusted Basis by IRS | Net Increase or Decrease |
|---|---|---|---|
| Radio Towers at Transmitter. . . . . | $70,000 | $15,050 | $54,950 |
| FM Towers . . . . . . . | 40,000 | 8,600 | 31,400 |
| Record Library . . . . | 30,000 | 15,000 | 15,000 |
| Studio & Office Lease . . . . . . . . . | 35,500 | 6,000 | 29,500 |

As discussed earlier, the tax basis claimed by the plaintiff in its income tax returns on those assets is based completely on the allocation of the purchase price as made by Blackburn and Company in January of 1961. The only factual basis upon which these allocations were made is provided by the testimony of Colin Selph, the former appraiser for Blackburn.

As to the FM radio transmitter tower and the studio and office lease, Selph testified that his appraisal was based on replacement costs. No indication, however, is given in his testimony to shed light on how he determined what those replacement costs were. We are thus faced with Selph's bare assertion that the tower was worth $40,000 and the lease $35,500. In addition to Selph, the plaintiff also presented the testimony of Raymond Rohrer, a consulting radio engineer. Rohrer's testimony was limited to the placing of a $5,000 value on one piece of transmitting equipment. With this single exception, neither Rohrer nor Selph has presented much probative evidence to support the plaintiff's allocation of the purchase price to these particular assets.

Opposed to the evidence placed in the record by the plaintiff is the detailed and fairly explicit testimony of defense witness Leon King, a valuation engineer with the Internal Revenue Service, and the appraisal report prepared by Richard Russell, real estate appraiser. Unlike that of the plaintiff, the record clearly shows the source of the government's evaluation of these assets.

■ Upon a detailed review of the evidence presented by the plaintiff to show the rationale for its valuation of the FM transmitter tower and the studio and office lease, we are of the view that plaintiff failed to meet the high burden of proof necessary to overcome the presumption of correctness of the Commissioner of Internal Revenue. We find this conclusion even more strikingly necessary where we consider all of the evidence in the record including the extensive and highly probative evidence of the government. For this reason we hold that the assessment of back taxes placed on the deductions taken for the office lease and the FM transmitter tower be sustained.

■ Similarly, we also find that the plaintiff failed to show by the presentation of substantial evidence that the Commissioner was wrong when he reduced the tax basis on the record inventory from $30,000 to $15,000. Selph in his testimony on this issue stated that he "spot-examined" the library and that it "was represented to contain" between 27,000 and 30,000 transcriptions. Since each physical record contains up to ten songs or transcriptions, the number of records in the library was admittedly far fewer than the number of transcriptions. Selph then proceeded to estimate that each transcription was worth about one dollar. [Tr. 327–29.] When this is compared to the uncontroverted evidence of King stating that the number of records, as opposed to songs, was closer to 9,000, and that a radio station could get many of those records either free as a promotion or at reduced prices from a distributor, the value of the collection seems to be far less than that established in the

Blackburn appraisal. [Tr. 609–15.] We therefore find that the plaintiff failed in his requisite burden of proof and that the presumption of correctness of the IRS must stand.

■ A somewhat different situation exists with respect to the AM transmitter and associated equipment. Although, as was the case with the studio lease and FM towers discussed above, the plaintiff at trial gave no basis or source for the replacement value of $70,000 he assigned to this particular asset, the government, through the highly detailed testimony of Leon King [Tr. 601–03], indicates that the value of the AM transmitter should have been $18,300 rather than $15,050 determined by the IRS. In this way we feel that although the plaintiff, alone, has not provided sufficient evidence to meet his burden of proof, in combination with the evidence introduced by the defendant, substantial evidence of the invalidity of the IRS's determination is present and its presumption of correctness must disappear. Based on all of the evidence before us, especially the highly probative testimony of the government's witness, we find in accord with the trial judge that the AM transmitter and related equipment must be assessed a tax basis of $18,300 rather than the $15,050 assigned by the IRS.

### Transmitter Site Lease

Prior to the purchase of the Old KFOX station by the plaintiff, the Old KFOX owned a lease for the AM transmitter site. The site of this lease was particularly valuable to KFOX because due to its low elevation and close proximity to Alamitas Bay, the particular transmitter provided an unusually strong non-directional signal. The terms of the lease called for, in addition to a flat rent, one percent of the gross revenues in excess of $30,000 per month. As plaintiff viewed the situation, this lease could potentially become a great financial burden to the station in the face of what was hoped to be a continued upswing in its profitability. For this reason, as we discussed earlier, plaintiff

made a renegotiation of the lease a prerequisite to the consummation of the purchase agreement.

The Old KFOX station succeeded in changing the lease to what Sonderling considered more favorable terms. In addition to the extension of the lease from the 16 years that remained to a full 20 years, the rental was made a flat $350.00 a month. However, because the particular tract of land on which the site was located had great potential value in residential development, the lessor demanded that the new lease provide that the lessor could at his own expense relocate the transmitter to any site within a one mile radius which was "equally suitable for lessee's purposes."

In allocating $50,000 to the transmitter lease, Selph of Blackburn and Company apparently took into consideration both the substantial financial savings to be gained by the new lease's terms as well as the particularly favorable location of the site itself. As Trial Judge Willi noted, the savings in rent due to the elimination of the gross revenue percentage override was quite substantial. Looking to the plaintiff's gross receipts for only the five years here in question as evidenced in its tax returns [Pltf. Exhs. 23–28], plaintiff's rental costs for the transmitter site would have been $38,579 under the old lease, nearly $17,200 more than it actually cost under the new flat rental lease. Plaintiff apparently maintains that the rental savings measured over the lifetime of the contract would equal or exceed the $50,000 tax basis allocated by Blackburn and claimed by plaintiff on its tax returns.

■ As a general proposition a lease may be valued for tax purposes based on the favorable location of the property, and, in addition, any potential income as well as savings attributable to the lease may be capitalized. John C. Dalton, Jr., 21 CCH Tax Ct. Mem. 435 (1962); William Penn Hotel Co., 23 B.T.A. 566 (1931); Werner & Werner Clothing & Furnishing Goods Co., 9 B.T.A. 69 (1927). *See also,* 10 Mertens,

**1374**

Law of Federal Income Taxation, §§ 59.-48, 59.50 (1970). Plaintiff must nevertheless show by substantial evidence that the Commissioner of Internal Revenue was incorrect in his readjustment of the lease's value from the $50,000 claimed by Blackburn and adopted by the plaintiff to $2,540. This we feel the plaintiff failed to do. As described in considerable detail in the government's appraisal report, prepared by an expert real estate appraiser, [Def. Exh. 7], the government maintains that the highest and best use of this particular tract was as residential development property similar to that which surrounded the site. Based on this use the government's expert, as backed up by the report, testified that the lease should rent for $387 per month rather than the $350 paid. Capitalizing this $37 a month savings over the remaining life of the new lease yields a total of $1,130 rather than the $50,000 claimed. Moreover, since the particular site was, as a result of its watery location, ideally suitable for a nondirectional transmitter and since any move made pursuant to the lease's alternative site option might result in a less efficient or even reduced coverage pattern [Tr. 475], the value of the new lease having this option is certainly questionable and its tax basis must suitably reflect this. In the light of the facts as presented at trial and heretofore discussed, we believe the assessment made by the Commissioner of Internal Revenue must stand, inasmuch as the plaintiff failed in meeting his burden of proof.

*Goodwill and the Five Service Contracts*

In addition to the lease for the transmitter site, Sonderling viewed the four Country and Western stars and the station manager as indispensable assets of KFOX and without their continued service would not have considered the purchase of the radio station. These C & W disc jockeys were seen by Sonderling to be at the heart of KFPX's change of fiscal fortune from running a monthly deficit to making a profit. To insure their continued association with the station, Sonderling insisted that the Old KFOX management place the individuals under contract, committing them to render service with the station and, most importantly, prohibiting their working for any other radio station in the Los Angeles area for the duration of the contract.

As urged by Sonderling, Old KFOX negotiated and executed contracts with the five individuals previously not working under any service contract. The four talent contracts were to last two years, each with an option of renewal by the station for an additional three year term. (Deacon Moore's renewal period was later reduced to two years.) Similarly Schofield, the station manager, was signed to a two year contract with a two year renewal option. As specifically requested by Sonderling, each of these contracts also contained an appropriate noncompetition clause:

* * * In consideration of this agreement, the artist agrees not to work, appear, or permit his voice to be heard on any radio station within a 100 mile radius of the Long Beach area during the term of this agreement or any extension, and the same may be enforced by injunctive proceedings.

The validity of the high value that Sonderling placed on these C & W disc jockeys was first demonstrated by the wholesale transplant of the loyal audience and sponsors of the successful KXLA to KFOX when the three original KXLA stars moved to KFOX in 1959. With the change of format to C & W music and with the popularity of its former KXLA disc jockeys, KFOX's revenues evidenced a dramatic and steady increase in the years from 1959 to 1961. That the increase in revenue was due to the C & W air talents is seen by the influx of new sponsors previously associated with KXLA and apparently brought to KFOX by the three disc jockeys that changed stations. As a result, therefore, of the three KXLA stars, advertising revenues of an incremental nature was brought to KFOX.

During the five years in question in the present suit the plaintiff maintains that Deacon Moore personally accounted for substantial advertising revenues. Thus an analysis of KFOX's advertising reveals that Moore generated the following income for the station:

| Year: | Revenues |
|---|---|
| 1962 | $82,300 |
| 1963 | 75,600 |
| 1964 | 66,900 |
| 1965 | 50,300 |
| 1966 | 38,900 |

[Pltf. Exh. 10.]

These advertising revenues represent sponsors that specifically requested to buy segments of time on Moore's show, many of whom Moore developed personally or came with Moore from KXLA.

Similarly, Biff Collie, the only C & W air artist who did not come to KFOX from KXLA, was a highly successful announcer, gaining a substantial listening audience at KFOX since he joined in 1959. Combined with Collie were the remaining two C & W announcers, Charlie Williams and Tom Brennan. These three popular announcers along with Moore were thus viewed by Sonderling as the primary factors in KFOX's new profitability.

 In addition to the incremental revenues that arose as a result of the presence of these C & W disc jockeys, both Sonderling and Blackburn put value on the non-competition clause of the new contracts. Because at this time there was a dearth of recognized C & W air personalities on the West Coast, and because Sonderling knew that there were a number of radio stations that were interested in hiring the four principal KFOX air personalities, the clause forbidding these personalities from performing in the Long Beach area during the existence of their contract had tangible and measurable value. In fact, shortly after plaintiff completed the purchase, Sonderling was approached by a competing radio station seeking to purchase the services of KFOX's announcers. While it is Hornbook law that one cannot obtain specific performance on a personal service contract, Restatement of Contracts § 379 (1932), it is equally clear that injunctive relief may be had for the enforcement of a covenant not to compete as found in these five contracts, so long as that clause is considered reasonable in duration and scope. 5 A. Corbin, Contracts § 1209 (1964).

The record is also clear as to plaintiff's view of Schofield's value to KFOX. At the time of the purchase of KFOX, Schofield had developed an intimate working knowledge of C & W format radio stations and in addition, maintained a close contact with the national advertising agencies serving the Los Angeles area. As a result of his wide expertise, Schofield acted in several different capacities while working at KFOX, serving as station manager, sales manager, program director, and general manager. At trial, Sonderling testified to Schofield's value:

> * * * [Mr. Schofield performed] the jobs of general manager, sales manager, salesman, and program director, he was an invaluable and thoroughly unique personality and in order to be able to operate this station at the budget that we thought it should be operated under, we could not have done so had we not had Mr. Schofield. [Tr. 441–42.]

The record produced by the plaintiff shows that in addition to the subjective value to the station, Schofield saved KFOX substantial money in salary as a result of the multiplicity of jobs that he handled. Thus, if KFOX had to hire a separate person for each position they would have had to pay at a minimum $122,000 in salaries, and perhaps as much as $187,000 [Pltf. Exhs. 5, 20—Tr. 28, 143, 203, 441], whereas in his first year of employment with KFOX, Schofield, doing the work of four, was paid $32,000 thereby saving the station at least $90,-000 in salary.

As a result of the incremental sponsors and revenues brought to KFOX by the C & W announcers, Schofield's value to the station, and the covenant not to com-

pete, Blackburn made the following allocation of plaintiff's purchase price:

### Artists

| | |
|---|---|
| Deacon Moore | $130,000 |
| Biff Collie | 70,000 |
| Charlie Williams | 40,000 |
| Tom Brennan | 10,000 |
| | $250,000 |

### Station Manager

| | |
|---|---|
| Dick Schofield | $150,000 |

Plaintiff adopted these figures as his tax basis in the returns here in question, deducting in each year a figure representing the amortization of these assets over the useful life of the contracts. The Internal Revenue Service denied this allocation completely, holding that these contracts were intangible assets that were inseparable from the concept of "goodwill" and as such were non-deductible.[1] The amount of the purchase price which the plaintiff allocated to these contracts was assigned to "goodwill and licenses" which after audit had a value of $564,985 or almost 64.4 percent of the overall purchase price.

At trial, while the plaintiff presented evidence on the value of the five contracts, the defendant put on no rebuttal evidence, instead relied on its legal theory that the personal service contracts as intangible assets were inseverable from goodwill and therefore not deductible. The legal issues that are before us at this point are first, whether the artists' contracts are severable from the general concept of goodwill; second, whether these contracts, even if severable, are amortizable; and third, whether the plaintiff has presented substantial evidence to overturn the IRS's presumption of correctness.

 As we have heretofore seen, the disc jockeys' and station manager's contracts are certainly intangible assets having significant value. The question is whether their value is one which is

separate from all of the other intangibles including goodwill. Case law indicates that a business' intangible value is divisible into its identifiable constituent elements for tax purposes. Parmelee Transp. Co. v. United States, 351 F.2d 619, 625, 173 Ct.Cl. 139, 148 (1965); Indiana Broadcasting Corp., 41 T.C. 793, 807 (1964), rev'd on other grounds, 350 F.2d 580 (7th Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 645, 15 L.Ed.2d 539 (1966); Strauss v. United States, 199 F.Supp. 845 (W.D.La.1961). Thus, these contracts can certainly be divided from the other intangible assets of KFOX so long as they are distinct and identifiable. However, whether they are so intertwined with the concept of goodwill as to be considered inseparable depends on the particular definition of goodwill that is used. Thus, if goodwill is defined to mean the intangible value of a going concern which is associated with the reasonable expectancy that old customers will return to the concern (or as in the instant case continue to listen to the same station) without any contractual compulsion, Commissioner v. Seaboard Finance Co., 367 F.2d 646, 649 (9th Cir. 1966), then it must be treated as a unitary concept and a deduction on any part of it will be disallowed. See Treas.Reg. § 1.167(a)–3. On the other hand, where "goodwill" is used as a catchall term for all of a going business' intangible assets that are associated with its profitability it is clearly divisible into its component parts. See Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 1224–25, 186 Ct.Cl. 1, 18–20 (1968). Parmelee Transp. Co. v. United States, supra.

In *Parmelee,* although the Internal Revenue Service allocated the value of an informal transportation arrangement to "goodwill" we, despite denying a deduction for the loss of that arrangement for other reasons, clearly held that this goodwill was divisible into its identifiable parts. "While we agree that the ar-

---

[1] In its assessment of taxes owed, the IRS permitted a depreciation deduction of $68,182 on the artists' contracts and $40,909 on the station manager's contract. These deductions were permitted by the IRS only because the relevant statute of limitations had passed and not because it recognized that these assets had some depreciable value independent of goodwill.

rangements were a part of the general goodwill or intangible value of the transfer business, * * * we reject the notion that goodwill is indivisible." [351 F.2d at 625, 173 Ct.Cl. at 148.] Goodwill was therefore considered to have its less restricted meaning.

Similarly, in *Meredith Broadcasting Co., supra,* we held that the value of a network affiliation contract was a separate and determinable intangible asset divisible from goodwill. In that case, the question before us was the proper allocation of that portion of the overall purchase price of an operating station that was due to a network affiliation contract, for the sake of determining what loss deduction would be permitted. To reach the proper allocation we first had to contend with the defense that these contracts were indivisible from all of the remaining intangibles and goodwill. Since the contracts were of significant and identifiable value, we found that they could be severed from goodwill, where goodwill was defined in its more general scope:

> * * * [T]he identity of a particular business arrangement or contract * * * is not lost and * * * the aggregate intangible value of a going business is composed of separate intangible assets which may be separately identified, valued and treated for federal tax purposes, regardless of what terminology may be employed. * * [405 F.2d at 1225, 186 Ct.Cl. at 20.]

In this way we permitted plaintiff to allocate part of the purchase price of a broadcasting station to a network contract to establish a cost basis for tax purposes. *Cf. Roy H. Park Broadcasting, Inc.,* 56 T.C. 784 (1971); *Indiana Broadcasting Corp., supra.*

 In the instant case the plaintiff has presented clear evidence showing that the five personal service contracts had significant and measurable value independent of their direct contribution to the value of plaintiff's goodwill and its FCC broadcasting licenses. These con-

tracts were necessary assets for the continued profitability of the station. They provided nothing to KFOX's institutional goodwill inasmuch as radio or television audiences are not loyal to a particular station so much as an individual star or format. *See* Meredith Broadcasting Co. v. United States, *supra,* 405 F.2d at 1216, 186 Ct.Cl. at 5. Should these stars move to another station, the audience in all likelihood would move also.

> * * * We agree that there is little, if any, goodwill between station and audience since, as has been demonstrated, viewers are concerned with the quality of programs rather than with the particular call letters or management of a station. * * * [Roy H. Park Broadcasting, Inc., 56 T.C. 784, 813 (1971)]

We therefore hold that such service contracts, as are found here, may be divisible from "goodwill" and other intangibles and be treated separately for tax purposes.

 Notwithstanding our holding that these contracts are independent assets severable from that of the station's goodwill, it must still be shown that they are amortizable or depreciable. In general, the cost of an intangible asset which can be shown to have a limited useful life is recoverable through a depreciation allowance over that asset's lifetime. Treas.Reg. § 1.167(a)–3 (1969). With respect to such intangible assets as contracts, the reasonable useful lifetime is its stated term. Triangle Publications, Inc., 54 T.C. 138, 147 (1970); David Hoffman, 48 T.C. 176 (1967). The existence of renewal options makes the useful life of the contract no less definite. Bonwit Teller & Co. v. Commissioner, 53 F.2d 381 (2d Cir. 1931), cert. denied, 284 U.S. 690, 52 S.Ct. 266, 76 L.Ed. 582 (1932); Birmingham News Co. v. Patterson, 224 F.Supp. 670 (N.D.Ala.1963), aff'd 345 F.2d 531 (5th Cir. 1965). However, as in any other intangible asset, a depreciation deduction is not allowed where the contract has no definite useful life, such as the case of network affiliation contracts

subject to revocation on 90 days notice. Commissioner v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 645, 15 L.Ed.2d 539 (1966); Westinghouse Broadcasting Co. v. Commissioner, 309 F.2d 279 (3d Cir. 1962), cert. denied, 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963).

Beyond the general rule that contracts having a definable lifetime may be depreciated, the Internal Revenue Service has recognized that the cost of personal service contracts may likewise be subject to a depreciation allowance, and in some cases its useful life may include renewal options. Rev.Rul. 137, 1971–1 Cum.Bull. 104; Rev.Rul. 379, 1967–2 Cum.Bull. 127. Cf. Commissioner v. Pittsburgh Athletic Co., 72 F.2d 883 (3d Cir. 1934). In Pittsburgh Athletic Co., supra, the court permitted the depreciation of an athletic contract although it limited the useful life to the one year of the contract without considering the reserve clause or renewal option that was part of it. This doctrine was expanded by the IRS in its Rev.Rul. 137, supra, in which the Service permitted the cost of a baseball player contract to be capitalized over the useful life which included both the one year term of the contract as well as the additional terms represented by the contract's renewal or "reserve" provision. The cost of the contract was defined to mean the amount paid or incurred on purchasing the contract plus any bonuses paid to obtain the signing. Taking into consideration the "reserve" clause in determining the useful life of a personal service contract was again reconfirmed by the IRS in its Rev.Rul. 137, supra, dealing specifically with a football player's contract.

■ Looking at the particular facts of the instant case we see no reason why the contracts of the C & W announcers and the station manager should be dealt with in a manner different from that of athletic contracts. In both cases the contracts represent independent and uniquely valuable assets to the taxpayer, ensuring through their non-competition clauses that the individuals under contract will not use their skills with any competing organization. To KFOX, as to the professional ball teams, the performers and their contracts are at the heart of the profitability of the taxpayer. Similarly, just as the renewal options of the athlete's contracts are to be considered in determining the useful life of the contract, so too should the single renewal option of the five contracts in question here be included in evaluating the useful life over which the costs of the assets will be capitalized. Therefore, we believe these service contracts are amortizable over the contract life which is measured by the contract terms plus the single renewal option.

We have noted that the plaintiff's four talent contracts and the station manager's contract are severable from the goodwill of KFOX, and, that as in other personal service contracts, no tax policy prevents their being amortized. It must yet be seen whether the plaintiff has presented substantial evidence to overcome the presumption of validity of the Commissioner of Internal Revenue's denial of a deduction.

As discussed earlier, the record in this case is replete with testimony and exhibits presented by the plaintiff tending to show that these contracts were worth the $250,000 and the $150,000 allocated to them as a tax basis. On the other hand, the government presented no evidence in opposition to that of the plaintiff but rather relied on their legal position that the contracts were inseverable from goodwill and as such were non-deductible. In the light of the evidence contained in the record and the invalidity of the government's legal position, it is apparent that the plaintiff has presented substantial evidence sufficient to pierce the presumption in favor of the IRS and cause it to disappear. With the defendant's presumption of correctness no longer before us, we are free to decide this issue based on all of the evidence presented in the record. Inasmuch as there is nothing in the record to

contradict the plaintiff's allocation of the purchase price to the five personal service contracts, we are constrained to sustain its position. In addition, to the extent that the plaintiff's allocation of its purchase price to these contracts is increased, the allocation made by the trial judge and the IRS to goodwill must be decreased accordingly.

■ We, therefore, hold that the four C & W disc jockey contracts should be assigned a total tax basis of $250,000 and that the station manager's contract should be assigned a tax basis of $150,-000. Plaintiff is therefore entitled to a refund for each of the periods in suit of so much tax and related deficiency interest as is attributable to an increase in depreciable basis of the five contracts as described above and as determined in further proceedings pursuant to Rule 131(c)(2). We also hold that the assessment of the Internal Revenue Service as to all of the remaining assets with the exception of the AM transmitting facility is approved and so much of plaintiff's claim for refund as is attributable to those reallocated assets is denied. Further, we hold that the tax basis for the AM transmitter facility should be increased from $15,000 to $18,300, as determined by the trial judge, and plaintiff be given such refund and interest as is attributable to this increase in depreciable basis.

## CONCLUSION OF LAW

Upon the foregoing opinion, containing the necessary findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover a tax refund for the depreciation of the five personal service contracts and the AM transmitter and judgment is entered to that effect. On all other matters we conclude that plaintiff is not entitled to recover and that portion of the petition is dismissed. The amount of recovery is reserved for further proceedings under Rule 131(c)(2).