MIAMI VALLEY BROADCASTING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miami Valley Broadcasting Corp. v. Commissioner
Docket No. 6302-71.
United States Tax Court
T.C. Memo 1976-194; 1976 Tax Ct. Memo LEXIS 206; 35 T.C.M. (CCH) 834; T.C.M. (RIA) 760194; June 17, 1976, Filed Bernard J. Long,James A. Treanor, III,D. Todd Christofferson,Richard L. Braunstein, and Patrick Hays Allen, for the petitioner. Robert T. Hollohan, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the amounts of $78,294.41 and $81,359.41 in petitioner's Federal income taxes for 1964 and 1965, respectively. Other adjustments having been settled by the parties, the following issues remain *207 for resolution: 1. The fair market value, if any, of a leasehold which petitioner acquired as part of the assets distributed in a liquidation pursuant to section 334(b); [1]/ and 2. The fair market value, if any, of certain contract rights, acquired in the same liquidation, to exhibit six baseball games on television. FINDINGS OF FACT Petitioner Miami Valley Broadcasting Corporation is an Ohio corporation with its principal offices in Dayton, Ohio. Petitioner filed timely corporate income tax returns for 1964 and 1965 with the District Director of Internal Revenue, Cincinnatti, Ohio. San Francisco-Oakland Television, Inc. (hereinafter SFO) was a California corporation which, from March 1958 through June 1964, owned and operated television station KTVU broadcasting from Oakland, California. On October 31, 1963, petitioner acquired the entire outstanding stock of SFO. On June 30, 1964, SFO was liquidated into petitioner pursuant to sections 332 and 334(b)(2).On that date, petitioner had a total basis of $13,013,940.14 in *208 the assets received in SFO's liquidation. 1. The Lease
As part of SFO's liquidation distribution, petitioner acquired a lease executed between SFO, as lessee, and the board of commissioners of the Port of Oakland (hereinafter the Port), as lessor, pertaining to the KTVU studio building and related land. In 1958, KTVU commenced broadcasting from a theatre in downtown Oakland and leased temporary office space in a warehouse in Jack London Square (hereinafter referred to as the Square). Discussions with the Port, which owned the Square, revealed that the Port was interested in securing KTVU as one of the Square's permanent tenants. The City of Oakland initiated development of the Square in the mid-1940's by purchasing what had been the City's principal waterfront area. The Square's namesake--the famous author Jack London--was a native of Oakland, moored a boat at its waterfront, and frequented a small bar located in the area purchased by the City. The Square was conceived of as a focal point and tourist attraction for the City. Consequently, the Port was selective of its tenants, permitting only those who would complement the other tenancies and enhance the nature of *209 the Square as a civic focal point. In 1957, when negotiations for the lease began, the Square's major tenants were restaurants. The Port was eager to secure other tenants, such as KTVU, which would promote the Square and which could attract visitors who would patronize the restaurants and other facilities located there. At the time the lease was negotiated it was assumed that KTVU would produce live shows and that the audiences would patronize the surrounding shops and restaurants. This arrangement was attractive to the Port since many of the tenants' leases measured rent by a percentage of gross receipts. The negotiations culminated in the execution of a 20-year lease. The lease commenced in August 1958, and on June 30, 1964, had 169 months remaining. The rental paid pursuant to this lease, and prior to its amendment in August 1963, was $4,163.52 per year for the land and $20,426.16 per year for the KTVU studio building. The lease provided that the Port would erect, at its expense, a finished television studio building for a cost not to exceed approximately $250,000. Under the terms of the lease, the improvements and any additions thereto are the property of the Port, *210 but SFO is obligated, interalia, to maintain the property in good condition, and to pay all taxes, assessments, etc., levied against the building or property. Pursuant to the lease, the Port could review the rental at the end of the first 10 years of the lease and, if the Port determined a higher rental was necessary, SFO had 6 months within which it could elect to terminate the lease. Finally, in recognition of the unique promotional value of KTVU as a tenant, the lease required KTVU to identify its location on the Square at least once in every 6-hour broadcasting segment. The Port constructed a building containing approximately 27,000 square feet of floor space. The structure was built to KTVU's detailed specifications and contained finished office space as well as television production facilities. The production facilities were designed and used for television broadcasts and contained two large studios, control rooms, decorated audience reception areas, heavy-duty air-conditioning and electrical power supply, workrooms, storage areas, and numerous other items uniquely required for television broadcasting. The Port supplied numerous items to the KTVU project including *211 the substantial structural steel girders needed to provide adequate studio height and lighting, construction labor, engineering and architectural supervision, and site landscaping. The Port also extended the paved and landscaped portion of the Square a full block north along the waterfront from Broadway to Washington Street in order to accomodate KTVU. KTVU was given the unique and prestigious address "One Jack London Square." Pursuant to the lease, KTVU identified its location at "One Jack London Square" several times a day. This was done in conjunction with the station identification required by the Federal Communications Commission. The location either appeared on a slide identifying the station or was announced by a voice over the station-identification slide. In 1964, KTVU charged $200 for a 5-second commercial spot. In 1962, as the need for more office space became apparent, KTVU considered opening some offices across the bay in San Francisco. However, after discussions with the Port, SFO constructed an addition to its Square facilities at its own expense of $30,000. In August 1963, the lease was amended to delete the rental review provision since SFO did not want *212 to erect the addition if the rent could increase substantially within a few years. In return for this amendment, rent was increased to a total net annual rent of $26,200. The minutes of the Port's May 20, 1963, meeting state, in part, as follows: The Board was informed by the Manager, Properties Department, that San Francisco-Oakland Television, Inc. proposes to make an addition to its building consisting of approximately 1,500 sq. ft. at a cost of $25,000 to $30,000. He advised that the company desires to be assured of a fixed rental rate for the next fifteen years of its occupancy of the building, either under its present lease which has five years to run prior to the renewal and rental review period for ten years, with the rental for the last ten years being set now, or under a newly negotiated lease for fifteen years with the present lease being canceled. The Manager, Properties Department, was instructed to proceed with negotiations, with the understanding that the Board did not wish any action taken which would jeopardize the continued occupancy of the facility by the present tenant. With the construction of KTVU in 1958, the Square was doubled in size. Between *213 1958 and 1964, many new tenants, including a motel with an adjoining marina and a convention hall, came to the Square. The Port also converted two old warehouses into modern office buildings, one of which had retail stores, a restaurant, and a bank on the ground floor. In 1964, KTVU's location on the Square was a very desirable one for broadcasting purposes. The Square was uniquely attractive and well-maintained. Several of Oakland's better restaurants were located there and it was a pleasant and convenient place for employees and visitors alike. In addition to the land subject to the lease, KTVU had exclusive access to an additional 4,500 square feet for parking. Finally, the Square location provided KTVU with direct microwave access to its transmitter across the bay, thus saving the cost of telephone transmission lines. There are no buildings located on the Square which are comparable to KTVU's complete studio facilities--a finished single-purpose structure. In 1964, the Port was leasing unfinished space to other tenants at a rate of 10 cents to 20 cents a square foot per month. Finishing costs comparable to those incurred for the studio facilities might add as much *214 as 10 cents per square foot per month to rental charges. Finished office space comparable to KTVU's office space was renting at approximately 35 cents per square foot per month. On its Federal income tax returns for 1964 and 1965, petitioner claimed amortization deductions of $34,138 and $71,961, respectively. 2. The Baseball Exhibition Rights
As a result of SFO's liquidation, petitioner acquired a contract with the National Exhibition Company (National) which granted SFO the right to exhibit all baseball games between the Los Angeles Dodgers (Dodgers) and the San Francisco Giants (Giants) played in Los Angeles. The contract covered the 1962, 1963, and 1964 baseball seasons and on June 30, 1964, six regular season games subject to the contract remained to be televised. SFO was required to pay National $10,000 for each game televised. KTVU was not affiliated with any major network, and its share of the audience averaged only approximately 8 percent. Broadcasting major sporting events substantially increased KTVU's ratings.For example, in the spring and summer of 1963 when the Giants and Dodgers were contenders for the National League pennant, the games attracted *215 as much as 65 percent of the audience. Although this figure was somewhat lower (approximately 5 percent lower) in May 1964, which is early in the baseball season, the audience share of KTVU for the broadcast time of the games equalled or exceeded that of KTVU's network affiliated competitors. On June 30, 1964, it would have been very difficult to estimate the audience rating of the games yet to be broadcast under the contract. The popularity of those games, which were to be played in late July and August, would depend upon whether the teams were in contention for first place at that time. The exceptionally large audiences attracted by the baseball games enabled KTVU to sell commercial advertising for exhibition during the game programs at rates considerably higher than its normal rates. On June 30, 1964, all advertising for the six remaining games had been sold and all costs had been set. The net profit to be derived was $9,100 per game or a total of $54,600. The average profit for comparable broadcast periods when games were not exhibited was $4,300 per game or a total of $25,800. Thus, the profit from the six remaining baseball games exceeded that of KTVU's customary programs *216 by $28,800. Television stations regularly advertise or promote themselves and their programs. Typically, this involves advertising in newspapers, on display billboards, and in a variety of other media. The large audiences attracted to KTVU by the baseball game telecasts afforded it a unique opportunity to advertise its program offerings, without substantial expense to itself, to the nearly half a million homes per game in the San Francisco Bay area. In addition to advertising its other programs, the extraordinarily large audiences attracted by the game telecasts tended to increase the carryover audiences for subsequent programs (known as audience "lead-in" or "carryover"). These ratings were also useful in convincing advertisers that KTVU was an effective advertising medium. Finally, the broadcasts were helpful in causing audiences to become accustomed to tuning to KTVU's channel 2. The right to televise baseball games can be offered to television stations on either a highest-bidder basis or an announced-price basis, in which case the first station to meet the announced price will purchase the rights. If offered on a highest bid basis, the network affiliates in San Francisco *217 would have a competitive advantage over KTVU since they had more capital and could outbid KTVU. The marginal benefits for an independent station would make the programming more valuable and attractive to a station such as KTVU. Prior to the 1965 baseball season, KTVU entered into a 5-year contract with National. The contract provided for the televising of 22 games per season at a price to KTVU of $300,000 per season. ULTIMATE FINDINGS OF FACT 1. The fair market value of the lease on June 30, 1964, was $350,000. 2. The fair market value of the baseball exhibition contracts on June 30, 1964, was $25,000.
OPINION Petitioner acquired the stock of SFO in 1963 and, on June 30, 1964, pursuant to section 334(b)(2) liquidated SFO. Section 334(b)(2) provides that a taxpayer's basis in the assets it acquires as a result of a liquidation distribution "shall be the adjusted basis of the stock with respect to which the distribution was made," and under applicable regulations, that adjusted basis is apportioned among the assets received in proportion to their net fair market value.Sec. 1.334-1(c)(4)(viii), *218 Income Tax Regs. The parties have stipulated that petitioner's basis in the assets received in the liquidation is $13,013,940.14 and that $3,129,081.53 thereof is allocable to certain specific assets not involved in this case. Petitioner seeks to allocate a portion of the remainder of the basis to two amortizable intangible assets--the lease and the baseball exhibition contracts--which necessitates a determination of their fair market value. 1. The Lease
Petitioner claims amortization deductions for the lease and argues herein that the lease had a fair market value of $1,018,396. According to petitioner, the value of the lease is attributable to a "sweetheart" arrangement with the Port: The Port bargained for less than a fair market rent in order to secure the benefits of having a television station, such as KTVU, as a tenant on the Square. Those benefits included promotion of the Square by KTVU and increased patronage for other tenants whose leases in several cases provided for a rent based upon gross receipts. The benefits were essentially cost-free to KTVU, but in return the station was situated in a most attractive and convenient section of Oakland. On the other *219 hand, respondent contends that the leasehold had no fair market value since the rent paid by KTVU was negotiated at arm's length as recently as August 1963, only a few months before SFO was acquired by petitioners. Respondent relies upon the fact that the Port would have entered into the same arrangement with any television station who was a prospective tenant of the Square. In short, respondent views the entire package as the result of an arm's length bargain of mutual benefit to both parties. We hold that the lease had a fair market value. There is no question that a leasehold may have a value in the hands of the lessee when the fair rental value exceeds the rent established by the lease. See KFOX, Inc. v. United States,510 F.2d 1365, 1373-1374 (Ct. Cl. 1975); A. H. Woods Theatre Co.,12 B.T.A. 827 (1928); cf. Leslie Co.,64 T.C. 247, 253-254 (1975). In the instant case, petitioner adduced convincing evidence that the location of KTVU was very desirable in terms of convenience and attractiveness; that the Port was very desirous *220 of securing a tenant such as KTVU; and that the collateral benefits for the Square and the Port were taken into account in negotiating a rental rate that would induce KTVU to remain as a tenant. When the lease was negotiated in 1958, the major tenants on the Square were restaurants.The addition of KTVU nearly doubled the size of the Square and that addition was the beginning of substantial growth and development for the Square. In addition, the cost to the Port of purchasing the land and constructing the KTVU facilities enabled the Port to earn an acceptable profit despite the reduced rental charge. It is true that the lease was amended in August 1963. However, the record is replete with evidence that the Port viewed the acquisition and retention of KTVU as a tenant as a matter of major importance. The minutes of the Port's May 20, 1963, meeting (set out in our Findings) indicates that the board "did not wish any action taken which would jeopardize the continued occupancy of the facility by the present tenant." In addition, although any television station might have negotiated for a similar arrangement prior to 1958, it could no longer do so as of June 30, 1964. There is no *221 evidence that the Port would have repeated the offer at that time to a second television station. Thus, in order to locate at the Square under the favorable terms of the KTVU lease, a television station or other interested party would have to negotiate with KTVU to purchase its lease. We do think, however, that the value attributed to the lease by petitioner is excessive. The Port purchased the land at a low cost during the mid-1940's and constructed the studio for $250,000 in 1958. Petitioner's witness testified that the replacement cost for the facilities was $800,000 on June 30, 1964--an increase of over 200 percent in 6 years. No evidence to corroborate such a dramatic increase in costs was presented. In using that figure in calculating a reasonable investment return for the lessor, petitioner did not take depreciation into account; assumed approximately 11 percent as a reasonable return on its investment, even though petitioner's own witness testified that 8 percent would be a reasonable return on the Port's investment; and did not discount the annual savings to their present value. In the light of the entire record, we have found the value of the lease to be that which *222 is set out in our Findings. 2. The Baseball Exhibition Rights
On June 30, 1964, the date of SFO's liquidation, petitioner acquired certain television rights under a contract between SFO and National. SFO was given the right by National to televise all of the baseball games played in Los Angeles between the Dodgers and the Giants. The contract covered the 1962, 1963, and 1964, baseball seasons, and required SFO to pay (to National) $10,000 per game televised. On the date of liquidation the costs and advertising revenues for the six games remaining to be broadcast were fixed. The net profits per game would be $9,100 for a total of $54,600. These revenues exceeded the normal net profit for the same time segments by $28,800. Petitioner argues that the contract had a fair market value of $119,500 attributable to four elements: 1. the excess profits generated by broadcasting the games; 2. the savings of expenses normally incurred to produce regular programs during the same time period; 3. the ability to transfer some of the advertising revenues to other time periods; and 4. the promotional value for the station of broadcasting the popular local baseball games. *223 Respondent contends that the contracts had no value in excess of the $10,000 per game payable under the original contract. In so arguing, respondent relies on the price payable under the contract negotiated for the season beginning in 1965--$13,000 per game. In essence, petitioner contends that it paid $119,500 (in addition to the $10,000 per game required under the contract) for the right to televise six baseball games despite the fact that within a year petitioner negotiated a similar contract under which it was to pay $13,000 per game. Considering the additional profit attributable to the broadcast of the games, promotional value, and all the evidence of record, we have found the value of the contract to be $25,000. Decision will be entered under Rule 155.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.