**Allan H. SELIG, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 81–C–334.

United States District Court, E.D. Wisconsin.

May 16, 1983.

David E. Beckwith, James P. Brody, and Nancy J. Sennett, Foley & Lardner, Milwaukee, Wis., for plaintiff.

Joseph P. Stadtmueller, U.S. Atty., and Melvin K. Washington, Asst. U.S. Atty., Milwaukee, Wis., and Lawrence L. Hoenig and Nancy Morgan, Trial Attys., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

The plaintiff taxpayer, proceeding under 28 U.S.C. § 1346(a), seeks a refund of income taxes that he paid under protest because the Government disallowed his proportionate share of the amortization (depreciation) of certain baseball player contracts of the Milwaukee Brewers Baseball Club, Inc. (Brewers). The Brewers obtained the player contracts in 1970 when the Brewers purchased the assets of the Seattle Pilots from Pacific Northwest Sports, Inc. (Seattle or Pilots). The Brewers allocated the $10.8 million purchase price as follows: $10.2 million to the 149 player contracts acquired; $500,000 to the American League franchise; and $100,000 to miscellaneous supplies and equipment. The allocation of $100,000 to miscellaneous supplies and equipment is not in dispute. The issue in this case is whether the allocation made by the Brewers between the value of the player contracts and

the value of the franchise was reasonable, and if it was not, what would constitute a reasonable allocation. For the reasons set forth in this decision, I find that the allocation made by the Brewers was reasonable.

This is a difficult case to sort out because of the conflicting views of law,* accounting, economics, and human motivations as they relate to organized baseball. At trial, each side operated on premises inapposite to the other's case. The taxpayer proceeded on the theory that operating a baseball club was a business, and the Government proceeded on the theory that operating a baseball club was, in part, a rich man's toy—something akin to a yacht—and that the Court's job was to decide what portion of the toy was not tax deductible. So at the outset I will set forth the assumptions (i.e., conclusions of law) that underlie my decision and which pretty much determine the outcome of the case, and second examine the general structure of professional baseball, especially the distinctions between the three markets in which player contracts are transacted—the player market, the free agent market, and the club market. I will then summarize the history of the Brewers' early efforts to acquire a professional baseball club to play in Milwaukee, the creation and development of the Seattle Pilots, the Brewers' purchase of the Pilots, and the manner in which the Brewers allocated the purchase price for tax purposes. In the last two parts of this decision, I will discuss the factors which lead me to conclude that the allocation made by the Brewers was reasonable and that the Government's valuations of the player contracts are unreliable.

The case was tried to the Court and lasted for about a month. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

I. ASSUMPTIONS (i.e., LEGAL CONCLUSIONS)

■ 1. Professional baseball is a business for tax purposes. The owners are therefore entitled to use generally accepted accounting principles in determining the profit or loss of a club and may take tax deductions that are available to other business enterprises.

The Government has argued that this is not so and that to an undetermined extent the operation of a professional baseball team is not for "business purposes" but is to give joy to the owners. It is further argued that this "joy" has a value and that this joy value should be attributed to the value of the franchise. Owners of baseball clubs, as well as owners of other enterprises, do receive a joy out of ownership. Allocation between the joy value and the business value is required for vacation homes and yachts that are partially used for business purposes, but this is not applicable here because professional baseball is a business, the allocation would be too speculative, and the tax laws do not recognize or tax the nonmonetary motivations of human beings as important as those motivations are. (Adam Smith notwithstanding, not all human motivations can be reduced to monetary terms.)

2. Baseball player contracts owned by the clubs are intangible assets which are known from experience to be of use for only a limited period, the length of which can be determined with reasonable accuracy. Thus, the cost of acquiring the contracts may be depreciated over their useful lives, and a tax deduction for that depreciation is allowed under § 167(a) of the Internal Revenue Code. The Government has not challenged the length of the useful life of five years over which the Brewers amortized their player contracts.

3. The mass asset theory which would have prevented professional sports clubs from deducting the depreciation of player contracts obtained as part of a bundle of assets has been rejected. *Laird v. United States,* 556 F.2d 1224 (5th Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978); *First Northwest Industries of America, Inc. v. Commissioner,* 70 T.C. 817 (1978), *rev'd and remanded on other grounds,* 649 F.2d 707 (9th Cir.1981). From an economic point of view, the mass asset theory was and is correct. It is eco-

nomically impossible to separate the value of the franchise from the value of the player contracts for, in fact, one is valueless without the other. It was for this reason that the Government urged the courts to adopt the mass asset theory in *Laird* and *First Northwest Industries.* The Government did not prevail in the mass asset theory, so it has abandoned it in this case.

Although it is a legal fiction that one can allocate part of the purchase price of a baseball club to the franchise and part to the player contracts in an economically sensible manner, it is the law that we have to allocate. (Legal fictions are not new to the law and are useful in solving legal problems. For example, we all know that it is a fiction that a corporation is a person, but in law we accept it as being true.) Once it is accepted that the allocation of the price among the assets is the law, then we are relieved of trying to explain it in rational economic terms and can proceed to test the reasonableness of the allocation in terms of generally accepted accounting principles and legal requirements. This process is necessarily arbitrary from an economic standpoint and depends on accepting legal and accounting definitions.

4. To allocate the purchase price among the individual assets purchased, it is proper to apply generally accepted accounting principles. Generally accepted accounting principles require the price to be allocated first to the tangible assets (bats and balls) and to the identifiable intangible assets (player contracts) based on the fair market value of each asset. The difference between the total amount allocated to those assets and the purchase price of the entire bundle of assets (the club) is allocated to a generalized intangible asset (the franchise). In this case, the tangible assets and the player contracts are depreciable while the franchise is not. The fair market value is the price at which an asset would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, in the economic market in which the asset was bought and sold. The economic market relevant to this case is the market in which entire professional baseball clubs are bought and sold, which I shall call the club market. Determining the fair market value of the player contracts through the use of appraisals is proper under generally accepted accounting rules.

5. Taxpayers have a right to know the tax laws and to consider the effect of these laws on their investments. The day has long since past, if it ever existed, that tax laws were enacted only to raise revenue. Tax laws always have been, are now, and in the future will be enacted to affect and direct the economic activity of taxpayers as well as to raise revenue. As far as being entitled to take tax deductions, those engaged in the baseball business are to be treated no differently than those engaged in other economic activities.

6. The Milwaukee Brewers Baseball Club, Inc., is the general partner of the Milwaukee Brewers Baseball Club, a limited partnership. The Brewers elected under § 1372(a) of the Internal Revenue Code to have the Internal Revenue Service treat the corporation as a subchapter S corporation. This election was proper and permits the deductions for depreciation to be passed through to the owners.

7. The Government has urged the Court to find that the limited partnership was "set up in part to allow the investors to claim tax losses on their own returns in excess of equity contributions at risk," and by implication to draw certain inferences and conclusions from this which are not clear to me. I decline to do so for two reasons. First, even if this is true, it is not illegal; and second, the evidence does not support such an allegation.

8. Throughout this case the Government has intimated that there exists in organized baseball a conspiracy to deprive the Government of its taxes. This is said to be true because the tax lawyers for the American League, the old club owners, the club buyers and their lawyers and their appraisers have all been aware of the tax laws and the tax effect of allowing the amortization of player contracts, and that with this unspoken and unwritten understanding they have

appraised the player contracts artificially high so that the new club owners can write off a larger percentage of their purchase price. It is true that the American League and the club owners, past and present, including the Brewers, have sought the advice of lawyers and accountants who specialize in taxation and are aware of the tax laws and regulations. Further, it is true that the Brewer's appraisers understood the concept of depreciating player contracts. To the highly suspicious, these facts suggest a conspiracy, but there is no objective evidence of such a conspiracy in this case, and I find that one did not exist. The investors in baseball have the right to seek legal and accounting tax advice and counsel.

## II. STRUCTURE OF PROFESSIONAL BASEBALL

Baseball is good for Americans (who can argue with this), but from a business standpoint, much to my surprise, professional baseball generally is unprofitable. Recognizing that baseball is good for Americans, the courts and Congress have helped professional clubs by taxing them as businesses and by historically exempting professional baseball from the antitrust laws.

The potential profitability of a baseball club depends heavily on the characteristics of the club's local market. Baseball revenues are not generally shared by all league members. The league members do share revenues generated from national broadcasts, and visiting teams do receive 20 per cent of gate receipts. But much of a club's revenue comes from home gate receipts, local television and radio broadcasts, and concessions. The local market strongly influences the amount of revenue generated by these sources. Of course, the amount and distribution of broadcast revenues is constantly changing in response to technological developments, such as cable television.

The tax laws help baseball clubs survive despite their unprofitability. The tax laws permit owners to write off (deduct) the cost of the player contracts that they purchase and to write off as an expense the cost of developing new players. This in effect enables the owners to double up on expenses (i.e., tax deductions) during the first five years of operation (i.e., the period of amortization). While baseball is generally an unprofitable business in terms of income from an investment, club owners generally hope to make a capital gain when clubs are sold, and they generally have done so in the past.

Professional baseball has also benefited by organizing as a legal cartel. Membership in the two major baseball leagues—the American League, of which the Brewers are a member, and the National League—is limited. The leagues operate under a strict set of rules established by the cartel. Among other things, these rules control the flow of new baseball talent into the major leagues and control the movement of players between members of the cartel.

Organized baseball controls new baseball talent through minor league farm systems operated by each major league club. Amateur players are drafted as free agents, and their talent is developed by their playing in the minor leagues. In this sense professional baseball is quite unlike professional football and basketball which rely primarily on colleges to develop their talent. The farm clubs generally lose money, about a million dollars per major league club per year. A club can expect to get two to four major league players a year out of its farm system.

The Government argues that the right to participate in organized baseball (i.e., to be a member of the cartel) is a valuable right which is nondepreciable because it enables the owners to buy players at a discount under the rules of the cartel. This is true as a matter of economics, but since the allocation of the purchase price is economically arbitrary, this does not help ascertain the amount to be allocated to the franchise under general accounting principles for tax purposes.

To determine the appropriate allocation of cost between the player contracts and the franchise, one must carefully distinguish the three markets in which player

contracts are bought and sold. These are the "player market," the "free agent market," and the "club market." Each market has distinct characteristics, rules, and mediums of exchange, and the cartel's rules control each market to a varying extent.

## A. *The Player Market*

The "player market" is the one that until 1975 we heard the most about, and it is still the one where most of the transactions take place. The player market is the one in which individual players are bought, sold, and traded. Players may move between the majors and the minors, between clubs, and between leagues.

There are two mediums of exchange in the player market: the player and the dollar. The player is the principal and dominant medium of exchange, and one cannot be active in the player market without a roster of players to draw from and to trade with. Players are traded for players now or in the future, for players and dollars now or in the future, and for dollars now.

Baseball rules establish an elaborate system of supply and price constraints in the player market. The most frequently discussed constraints are known as the reserve rules and the waiver rules. Under the reserve rules, each major league club is entitled to protect forty players from being drafted by other clubs. This is done by placing the players on the reserve list, also known as the 40-man roster. During most of the playing season, only twenty-five players will be active. This 25-man roster is also known as the active roster. Players not placed on the 40-man reserve list may be drafted by other clubs at the annual December meeting, known as the Rule 5 draft. Dollar prices for players acquired in the Rule 5 draft are fixed according to the classification of the selecting team. A player drafted by a major league club is sold for $25,000.

The waiver rules provide that during certain times of the year, a player cannot be assigned to another club without first offering the player to all other teams in his league. If all other teams waive the right

to acquire the player, the assignment may take place. If instead one or more other clubs claim the contract, the offering club must either withdraw its offer or allow the player to go to the claiming club with the poorest record. The dollar price for a player acquired on waivers is fixed at $20,000.

Because of the tight supply and price constraints imposed on the player market, the price at which a player would be transacted in this market has little correlation to (1) the price at which the player would be transacted in a free market, (2) the salary paid the player, or (3) the cost of developing a player through the farm system. Further, because of the constraints, the best players are seldom traded and almost never sold for dollars alone in the player market.

## B. *The Free Agent Market*

The free agent market is the market in which the players, rather than an assigning club, negotiate for their contracts. The free agent market has two components: the free agent draft and the re-entry draft. In the free agent draft, major league and minor league clubs draft the right to negotiate exclusively with amateur players, meaning players who have not previously contracted with a major league or minor league club. This draft occurs at the winter and summer meetings. In the re-entry draft, clubs draft the right to negotiate exclusively with veteran players. Since 1976, the reserve rule has provided that after six years of major league service, a player no longer under contract may declare himself a free agent. The re-entry draft takes place in November.

The free agent market is more like a free market than is the player market. Its medium of exchange is the dollar. Although a number of the cartel's constraints affect the free agent market, the price at which free agents transact is not fixed. Because the best players can negotiate higher salaries, transactions involving the best players occur in the free agent market through the re-entry draft, whereas such transactions seldom occur in the player market.

The free agent market is relevant as a guide to the money value of a player in a free market, although comparing transactions in the free agent market with transactions in the player market is difficult.

## C. The Club Market

The last market in which player contracts are transacted is the club market. This is the market in which entire baseball clubs are bought and sold at one time. The club includes player contracts, the league franchise, and physical assets. The medium of exchange in this market is the dollar.

The club market is essentially a free market. Where an existing club is sold to a new owner, the price is freely negotiated. Cartel approval is required to move a club, but the cartel does not have to approve the sale price. The purchase price for the club depends upon the value of the player contracts to the club, not upon cartel rules or the value of the contracts to the players. In the past, when clubs have been created through expansion of the league, the price was set by the league and the buyer could accept or reject it. If he was smart, he accepted it, for experience has demonstrated that the expansion prices have been less than later comparable negotiated prices.

The Brewers' purchase of the Pilots took place in the club market. Therefore, the Court's task is to determine the fair market value of the player contracts to the Brewers in this market, which is what the contracts would cost in a free market. Most of the Government's evidence of contract values pertained to the player market, which is not a free market. Further, the Government argued that that franchise is a club's most valuable asset, but I find that the main asset acquired in the club market is the roster of players, for the players are used not only to play ball but as a medium of exchange in the player market.

## III. BREWERS' EARLY EFFORTS TO ACQUIRE A MAJOR LEAGUE CLUB 1965–1969

Allan H. Selig, the taxpayer and plaintiff, organized a group of Wisconsin investors and with them formed the Milwaukee Brewers in August 1965. In that year, the Milwaukee Braves of the National League of Baseball Clubs, over the objections of almost everyone in Milwaukee, moved its team to Atlanta, Georgia, leaving Milwaukee without a major league baseball club. Selig had been a shareholder in the Braves. One of the purposes of the Brewers was to acquire and operate a professional baseball club in Milwaukee. Selig has been the president of and a shareholder in the Brewers, and Edmund B. Fitzgerald was its vice-president and a shareholder. In May 1966, the Brewers elected to be treated as a small business corporation for federal income tax purposes under § 1372(a).

Between 1965 and 1970, Selig and Fitzgerald were actively involved in trying to acquire a professional baseball club to operate in Milwaukee. Applications for a franchise were made with the American League in 1966 and 1967 and with the National League in 1966, 1967, and 1968, and efforts were made to purchase existing teams in either league with the intent of moving one to Milwaukee.

In the summer of 1969, Selig and Fitzgerald negotiated with Arthur Allyn for the purchase of the Chicago White Sox with the expectation that that team would be transferred to Milwaukee. A price of $12,400,-000 to $12,500,000, which included the purchase of the White Sox ball park, was discussed. The negotiations fell thru in August when Allyn's brother, a 50% shareholder, determined that he did not want to sell.

## IV. CREATION AND DEVELOPMENT OF THE SEATTLE PILOTS 1967–1969

In 1967, the American League decided to expand by adding two franchises in 1968 with play to begin in 1969. Milwaukee's efforts to secure one of those franchises failed. The franchises were awarded to Kansas City and Seattle.

The Seattle franchise was sold to Pacific Northwest Sports, Inc. (Seattle or Pilots). The president of Seattle was Dewey Sori-

ano, its treasurer was his brother Max Soriano, and its major shareholder was William Daley of Cleveland.

Seattle paid the price set by the American League for the new clubs. The league broke down the price as follows: (a) $5,250,-000 for 30 player contracts to be acquired in the October 1968 expansion draft from the ten existing clubs at $175,000 each; (b) $100,000 for the franchise; (c) a contribution of a prorata share to the operation of the commissioner's office and to the Major League Pension Fund (the Central League Fund) for three years; (d) foregoing of national television or radio revenues from the existing national contact for three years; and (e) 2% of their gate receipts for three years.

The $175,000 price per player contract was established at a league meeting in Mexico City in November 1967. It was based in part on the costs incurred in connection with developing a player and in part on what the owners thought a buyer would pay. At that time the player development costs (i.e., costs of scouting in the minor leagues, etc.) were in excess of $175,-000 per player. The members of the American League who set the price at $175,000 per player were generally aware that that figure, if accepted by the IRS, would enable the buyers to write off the cost of the players over a period of years.

In anticipation of being granted a major league franchise, Seattle acquired the California Angels, an AAA minor league team, in October 1967. Seattle paid $75,000 for the Angels. Seattle also entered into a working agreement with a minor league club in Newark, New York; and in June 1968, Seattle participated in the majors' rookie draft.

Seattle hired Marvin Milkes as general manager; Robert (Bobby) Mattick; Karl Koehl, Bob Clemens, Bill Skiff, Earl Silverthorn, and Earl Torgeson as scouts; and Art Parrack and Ray Swallow as farm directors. (Milkes and Mattick would later move with the team to Milwaukee and would appraise the value of the player contracts acquired by the Brewers.) By the fall of 1968, Seat-tle not only had a scouting system and minor league farm system, including working agreements with Montreal, Clinton, Newark, and Billings, but had incurred team development expenses in the amount of $1,114,419 in connection with the operation of the Angels and the operation of its Newark team and for scouting and signing players.

In October 1968, Seattle participated in the American League expansion draft. Milkes made initial draft decisions and then consulted Dewey Soriano about the final decisions. Kansas City also participated in the same draft with Cedrick Tallis (who later became one of the Brewers' appraisers) making its draft decisions. The players were selected from the ten existing American League teams. Initially each existing team protected a list of fifteen players. Seattle and Kansas City drafted one player each from the remaining players, and then the ten existing teams each protected three more players. This process continued until Seattle and Kansas City each had thirty players. Draft picks were made from both the major and the minor leagues. The last player drafted was the thirty-sixth man from an existing team. The League determined that this system would make available to the expansion teams higher quality players than would a system where each existing team provided a list of players who could be drafted, as was done in the past.

In 1969, Seattle added to its roster, developed its organization, and played ball from April to September. Except for the fact that they were losing money, they were doing very well. By June, the owners realized that they were in severe financial difficulty, that no additional money could be put into the team, and that it had to be sold. Their operating expenses in 1969 amounted to $3,773,701.

## V. THE PURCHASE OF SEATTLE BY MILWAUKEE

After the White Sox negotiations fell through, Selig remained determined to get a team for Milwaukee. He heard about Seattle's financial problems and contacted

them. This resulted in a meeting with Selig, Fitzgerald, and Max and Dewey Soriano in Seattle. This was followed by a meeting in Cleveland with William Daley, the major shareholder of Seattle, and further negotiations in the Bird Feed Room in the Baltimore stadium at the World Series in October 1969. Seattle asked for approximately $13,000,000, and Milwaukee offered about $9,500,000. During these negotiations, Dewey claimed that the value of the Seattle team was based on its players, farm system, scouts, and the fact that during the previous three years, Seattle had invested large sums of money in the team. It certainly was not based on the profitability of the team in Seattle.

The deal was closed with a handshake in October 1969 with Milwaukee agreeing to purchase Seattle, including its complete roster of 149 players, for $10,800,000. The purchase price was negotiated in a free and open market (the club market) and the negotiations resulted in an arms-length transaction between a willing seller and a willing buyer. The purchase price was determined without any reference to rules of baseball or American League constraints which are present in "sales" of individual players in the players market. The deal was conditioned on American League approval of the club's transfer from Seattle to Milwaukee but not on approval of the sales price.

The American League failed to approve the transfer to Milwaukee but instead attempted to save the financially troubled Seattle team by putting more money into it. These efforts were unsuccessful. In March 1970, at the suggestion of the Brewers' attorneys, Seattle filed a petition for bankruptcy in the United States District Court for the Western District of Washington.

While this was going on, Milwaukee, through Selig and Fitzgerald, continued their efforts to close the deal which had been struck in October 1969. On March 8, 1970, an agreement for the purchase and sale of the assets of Seattle at $10,800,000 was reduced to writing.

The bankruptcy court came to the rescue of the parties and ordered that the sale of the team to Milwaukee be completed by April 1, 1970, and on that date Milwaukee acquired the team which included membership in the American League, 149 player contracts, scouting and coaching contracts, and baseball equipment. The team started to play ball in Milwaukee six days later as the Milwaukee Brewers. On April 9, 1970, the Milwaukee Brewers Baseball Club, a Wisconsin limited partnership, was formed. The Milwaukee Brewers Baseball Club, Inc., became the general partner of the limited partnership and assigned to the Milwaukee Brewers Baseball Club all of the assets acquired by it from Seattle.

## VI. ALLOCATION OF THE PRICE AND APPRAISALS OF THE PLAYER CONTRACTS

At the suggestion of Milwaukee, the contract between Milwaukee and Seattle allocated the purchase price of the club in the following manner:

(A) American League membership and franchise—$500,000;

(B) Player Contracts—$10,200,000; and

(C) Miscellaneous supplies, equipment, and other assets—$100,000.

Immediately after the transfer, Selig and his staff were so busy getting their team going that they did not get around to ordering appraisals for several months in spite of being urged to do so by their lawyer, but eventually they did so. Appraisals of the value as of April 1, 1970, of the 149 man roster were ordered and made in the fall of 1970. The individuals asked to perform the valuations were Frank Lane, Cedric Tallis, Bobby Mattick, and Marvin Milkes.

The following appraisals of the roster as of April 1, 1970, were made and submitted in the fall of 1970:

| Lane | $10,351,000 |
|------|-------------|
| Tallis | $10,358,000 |
| Mattick | $ 9,685,000 |
| Milkes | $ 9,778,000 |

The average was $10,043,000. After discussion with the Brewers' auditors and others, Robert Schoenbachler, the Brewers' finan-

cial officer at the time, decided it was appropriate to take the $10.2 million allocated to the player contracts by the purchase contract and apply it pro rata to the player contracts for amortization purposes.

## VII. REASONABLENESS OF THE ALLOCATION MADE

The plaintiff has urged the Court to assess the reasonableness of the $10.2 million allocation to the player contracts by reference to five items:

1. The appraisals;
2. Cost of player development;
3. Insurance on team's roster;
4. Small value of the franchise; and
5. Contracts of players who were free agents.

### A. *Appraisals*

The Brewers contend that the four appraisals performed for them in 1970 provide a reasonable basis for their allocation. Appraisals by independent and knowledgeable persons is an appropriate method of determining the fair market value of an intangible asset according to generally accepted accounting principles. Appraisals made by persons who are not independent may be relied upon only to confirm appraisals made by independent persons.

I find that Lane and Tallis were knowledgeable and independent appraisers. Lane, who is now deceased, had long been associated with baseball in a variety of capacities, holding positions as a scout and general manager. He had been a longtime friend and confidant of Selig and had advised him in player personnel matters pertaining to the acquisition and purchase of a baseball club. After his appraisal in 1970, Lane, widely known in the industry as "Trader Lane," became the general manager of the Brewers, but there is no showing that he was not an independent appraiser in 1970. Lane's personal relationship with Selig was not such as to cast doubt on his independence as an appraiser. Tallis, who is now executive vice-president of the New York Yankees, was actively involved in baseball since the late 1930's. His knowl-

edge of the roster acquired by the Brewers stems from the fact that during the 1968 expansion draft, he was the general manager of the Kansas City Royals and was drafting from the same list of available players as was Marvin Milkes for the Seattle Pilots. He relied not only on statistics but on personal observations, scouting, reports, and conversations with general managers. Kansas City potentially faced a dispute with the IRS over deductions for amortizing its player contracts similar to the present dispute with the Brewers, but this fact alone does not impugn Tallis' independence as an appraiser.

Milkes and Mattick were also knowledgeable appraisers, but they were not independent in 1970. Milkes, now deceased, had an extensive career in baseball. He was knowledgeable about the value of the players listed on the 149 man roster as he was the general manager of the Seattle Pilots from 1968 through 1970, and participated in the scouting and signing of players for Seattle, both for farm team acquisitions and for the 1968 expansion draft. Milkes moved with the team to Milwaukee in 1970 and became the Brewers' general manager. Since the 1940's, Bobby Mattick has served as a scout, a farm director, and a field manager for various baseball organizations. He was a scout with Seattle beginning in 1968 and continuing through his service with the Brewers to 1972. He is currently the director of baseball operations for the Toronto Blue Jays. He was a knowledgeable witness. Appraisals by persons who were not independent were received for the limited purpose of comparing them with appraisals made by independent persons. The appraisals made by Mattick and Milkes were lower than those made by Lane and Tallis.

The status of some of the players changed shortly after April 1, 1970. Some players whose contracts were valued fairly high were shortly thereafter released or sold in the player market for amounts less than their appraised value in the club market. The Government claims that impeaches the appraisals. It does not. Changes in player status is a continual process in base-

ball. A release of a player in order to acquire another player in the player market on April 15, 1970, does not indicate that the player had no value in the club market on April 1, 1970. It is like saying that because a Russian ballet dancer has little value in Moscow, the dancer has little value in New York. The appraisals for the club market were estimates of the value of the player contracts to the club in a free market unconstrained by the rules of the American League; the releases and sales which took place in the player market were in a different market, one constrained by the rules of the American League. The Government's argument totally confuses the two markets.

The Brewers did not allocate the average appraised value to the player contracts but rather allocated the slightly higher amount allocated by the purchase contract. The allocation of $10.2 million made in the purchase contract with Seattle must be ignored unless it is an indication of the fair market value of the assets. Although the purchase price of $10.8 million was arrived at through negotiations and was the free market price for the club, the $10.2 million allocated to player contracts was not arrived at through negotiation. While the appraisers did not know that the purchase contract had allocated $10.2 million to the player contracts, they did know that the total purchase price was $10.8 million, and it was common knowledge in the baseball industry that most of the purchase price for baseball clubs was allocated to player contracts. These facts shifted the burden to the Brewers to prove that the allocation was reasonable.

They have met their burden. The $10.2 million allocation was made by Thomas J. Donnelly who at the time was plaintiff's attorney. Donnelly decided upon the $10.2 million figure after discussions with a number of baseball people, including Schoenbachler, Fitzgerald, Selig, and Max Soriano. Donnelly also had information on the allocations made by other clubs, and, in comparison, the amount the Brewers allocated to the franchise, i.e., $500,000, was large. After the appraisals were made, it turned out that the $10.2 million figure, while not the arithmetic mean of the appraised values, was within the range of appraised values.

## B. Cost of Developing Major League Players

Another test of the reasonableness of the allocation is to analyze the costs of developing a player. Major League Combined Statements for 1970 and 1971 show player development costs of approximately $31,000,000 for all twenty-four major league clubs or $1,200,000 per club per year in 1970 and 1971. The total player development costs for the New York Yankees during the late 1960's and early 1970's were between $1,000,000 and $1,400,000 per year. Player development costs in 1969 were $1,317,000 per team annually. By incurring these costs, each major league club can expect two to four players per year to move up from the minors to the twenty-five man major league roster.

If one computes the cost of developing a major league player by dividing the average annual player development costs by the average number of players who move up from the minor leagues, then a rough approximation of the cost to develop a major league player would be $350,000. The experience of the Baltimore Orioles is that their average cost of developing a major league player from 1968–1971 was $437,166. The Brewers' cost per player from 1970–1975 was $294,304.

If we assume that the average development cost of $350,000 per player approximates the fair market value of a major league player contract acquired in the club market, then the twenty-five man major league roster acquired by Milwaukee from Seattle would have a total fair market value of $8.7 million. In addition to the twenty-five man major league roster, Milwaukee acquired seventeen other major league players and 107 minor league players. It seems reasonable to find that their contracts were worth at least $1.5 million. This supports plaintiff's position that the

149 player contracts acquired by Milwaukee were worth about $10.2 million.

The Government does not agree with this method of calculating the cost of developing a major league player. The Government urges the Court to divide the player development costs per team by the number of minor league players, which would yield a development cost of about $30,000 per player. This assumes that the cost of a player who moves into the major leagues from the minors is the same as the cost of any minor league player, and that the purpose of the minor leagues is to give the boys an opportunity to play baseball. This is not true.

The primary purpose of the minor leagues is to develop talent for the major leagues. The Government argues that the minor league farm system serves many purposes. This is true in that the minor leagues bring players up to the major leagues; serve as a "hanger" by holding players with major league talent until there is room for them on the major league rosters; tie up baseball talent so as to hinder the formation of any competing baseball leagues; and keep major league players sharp through practicing or playing together. But the evidence establishes beyond a doubt that the main reason the major league clubs operate minor league clubs is to develop new major league players.

I find that dividing the average annual player development costs by the average number of players making it onto the major league roster is a helpful tool in estimating the value of a player contract purchased in the club market. The question is, after all, how much it would cost to obtain a major league player by alternative means. Presumably, that cost would be in the neighborhood of what it would cost to develop the players so acquired. The average development cost per major league player is objective evidence that supports the appraisals of Lane, Milkes, Mattick, and Tallis.

### C. Player Roster Insurance

It is also helpful to ascertain the reasonableness of the allocation and of the appraisals by checking the amount of insurance that clubs carry on their players. Presumably the clubs carry enough insurance to replace their rosters in the unfortunate event they are all lost in an airplane crash. The American League disaster insurance plan provided each team with $3.5 million in coverage on loss of its players. During 1970, Seattle supplemented this with an insurance policy having an aggregate limit of $7.8 million for a total of $11.3 million for the team. Prior to February 1972, the Brewers' total player valuations for insurance purposes was approximately $7.6 million in addition to the league insurance. While many factors other than fair market value are considered in determining insurance values, insurance values do bear a relationship to fair market values. Total insurance coverage on the player contracts exceeded $11 million both at Seattle and at Milwaukee.

### D. Franchise Value

The allocation of $10.2 million is also reasonable in view of the small value of the right to play baseball in Milwaukee, the franchise. The right to play baseball in Milwaukee is not worth much; everyone agrees on that. For instance, defendant's expert, Dr. Roger Noll, testified that in 1973, Milwaukee was not viable as a baseball market, and the franchise rights alone in Milwaukee had no value. Even with the doubling up of tax write offs of player contracts which occurs in the first five years of a club's existence, the Brewers lost money during their first five years of operation. Thus, as shown by plaintiff's trial Exhibit 111A, attached as Appendix I to this decision, the Brewers would not have shown a profit even if player contracts were not depreciated.

The small value of a major league franchise in Milwaukee results largely from the dependence of baseball revenues on the local market characteristics. In 1970, the Milwaukee market ranked seventeenth in population out of twenty cities in which major league baseball franchises were located. Based on the Rannally city rating of major league baseball cities which indicates

the relative commercial importance of these cities, Milwaukee ranked eighteenth out of twenty. Milwaukee is located 89 miles north of Chicago where the White Sox and the Cubs are located. Milwaukee is on Lake Michigan, and to the northwest of Wisconsin is Minneapolis, Minnesota, where the Minnesota Twins are located. Fan interest in Milwaukee was and is high, but it is these demographics which severely limit the value of the franchise, the profitability and the return that it yields to the investor, and the earnings potential.

### E. Free Agent Market Transactions

Transactions that occur·in the free agent market are the plaintiff's final guide for assessing the reasonableness of the allocation. That evidence indicates that plaintiff's appraisals of the player contracts are within the range one might pay for a player contract.

Transactions in the free agent market are difficult to compare to those in the club or player markets because the cost of the free agent contract manifests itself in the salary paid to the free agent, not in a price paid to a current owner of the contract. Nonetheless, the salaries of free agents for one year are often dramatically higher than the cost of player contracts in the player market or the amounts the Brewers allocated to the contracts they acquired from the Pilots in the club market. The best players have received annual salaries on the order of a million dollars as free agents, indicating that their services are worth quite a bit. From this it is reasonable to conclude that the value of the contracts in the club market would be high because the salaries under the contracts are depressed. I find that this supports the reasonableness of the allocation made by the Brewers.

### VIII. THE GOVERNMENT'S EVALUATIONS OF THE PLAYER CONTRACTS ARE UNRELIABLE AND IRRELEVANT

The United States used two approaches to prove that the proper allocation of the purchase price of the club was something other than the allocation made by the plaintiff. First, the United States tried to show that the value of the entire package was less than the $10.8 million that the Brewers paid, and therefore that the excess payment should not be deductible as a business cost. Second, the United States tried to show that the true value of the player contracts was at most $3.5 million. To prove that the $10.8 million purchase price was excessive, the Government calculated the "going concern value" of the Brewers. To show that the player contracts acquired were not worth $10.2 million, the Government relied on the following: a regression analysis; an income sensitivity analysis; recent appraisals by Government experts; and a comparison of the relative contract and salary levels for the Brewers with those levels for players whose contracts were bought and sold in the player market.

### A. Going Concern Value

To show that the value of the entire package purchased by the Brewers was less than $10.8 million, the Government's expert, Dr. Roger Noll, ascertained the going concern value of the Brewers. Dr. Noll calculated the going concern value in two ways. First, he calculated the going concern value as the discounted present value of the annual gross operating margins anticipated in the financial forecasts done for the Brewers prior to the purchase of the Pilots. These financial forecasts were made to induce people to support and to invest in the baseball team. Because the forecasts assumed great attendance, great victories, and great profits, the going concern value calculated from them would tend to be high. Even so, at a 15% discount rate, which Dr. Noll estimated was reasonable given the risks inherent in operating a major league baseball club, the financial forecasts yielded a going concern value of between $6.7 and $7.2 million. Second, Dr. Noll performed a similar calculation based on the average American League annual gross operating margins. The average American League going concern value was $3.2 million.

The defendant's argument that the difference between the $10.8 million purchase

price and the calculated going concern value cannot be treated as a business cost is without merit. I am unimpressed with the defendant's going concern analysis because the results it yields contradict experience in the marketplace. Where a free market exists for an item, the best method of determining its fair market value is to look at the free market price. A free market does exist for baseball clubs, and the prices for existing clubs have been uniformly higher than the going concern values calculated by Dr. Noll. See trial Exhibit 480 attached as Appendix II. That a taxpayer pays a higher price for a business than would some other "prudent investor" concerned solely with return on investment does not make the difference a nonbusiness cost. The market determines the fair market value of the club. Purchasing a major league baseball club is not a wise investment from the standpoint of rate of return on investment, but it is nevertheless still a business investment. For the reasons stated in my discussion of the assumptions that underlie this decision, this Court cannot allocate part of the $10.8 million purchase price to the emotional aspects of the purchase, such as "civic pride" and the "joy of ownership."

The $10.8 million was the fair market value of the Seattle Pilots Club in the club market when it was purchased by the Brewers. The purchase price was negotiated in a free and open market and the negotiations resulted in an arms-length transactions between a willing seller and a willing buyer. The transfer of the club was subject to American League approval, but this did not in any way affect the nature of the negotiations or the resulting price. An examination of the prices for which other clubs sold from 1966–1980 as well as the price discussed in the Brewers' negotiations the Chicago White Sox during the summer of 1969 establishes that the $10.8 million figure was in the range of the going prices for baseball teams at that time.

B. *Dr. Noll's Valuation of Player Contracts*

Dr. Noll used two other approaches to arrive at a value for the player contracts.

First, he developed a sophisticated theoretical model of how player contract values are determined and then used a multiple regression analysis to derive an equation that would predict the contract value of players. This equation was then used to estimate the value of the players obtained by the Brewers. His second approach was an income sensitivity analysis. In this approach, Dr. Noll estimated the proportion of the Brewers' revenues that were sensitive to player quality, and then allocated that proportion of the purchase price as the value of the player contracts.

I accept Dr. Noll's theoretical model of how player contract values are arrived at as an economically sensible model. However, the premise underlying both of Dr. Noll's analyses is that the purchase price can be allocated for tax purposes between the franchise and the player contract in an economically sensible manner. As stated earlier, such an allocation cannot be made in an economically sensible manner. Indeed, Dr. Noll adheres to the mass asset theory and testified that any allocation will be arbitrary. Further, his analyses were fundamentally flawed in that he used data from player market transactions to try to predict the fair market value of those contracts in the club market. Numerous practical difficulties in applying his theoretical model, including incomplete data, made his analyses even less reliable.

1. *Regression Analysis*

Regression analysis is a method of deriving an equation from which the expected value of a dependent variable (e.g., player's contract value) could be calculated based upon known values of the independent variables (e.g., player's age, batting average, at bats). In this case, the underlying assumption is that there is some correlation between a player's contract value (the dependent variable) and the player's statistics and salary level (the independent variables). The equation essentially says that if one knows that a player has certain playing

statistics and a certain salary, one would expect his contract to be worth the amount predicted by the equation derived. By examining a sample group of players, noting each player's contract value, playing statistics, and salary level, one can use regression analysis to derive this equation which estimates the correlation between the contract value (dependent variable) and the player statistics and salary level (independent variables).

Dr. Noll's theoretical model of how contract values are determined begins with the concept of the marginal revenue product (MRP) of a player. The MRP is the amount of money that adding a particular player would contribute annually to the net revenues of a team, ignoring the cost of the player's salary. In a free market, a player's salary should equal his MRP. However, the player reserve system depresses salaries which, in theory, makes the contract rights to the player's (i.e., the slave's) services more valuable to the team. In addition, salaries paid to players of comparable ability may vary depending on such things as negotiating skills and whether a player turns out to be better or worse than anticipated when his contract was signed. Comparable ability is in the eyes of the team owner and depends on subjective factors as well as objective factors, such as player statistics.

Dr. Noll testified that an economist would expect a player's contract value to be the present value of the expected annual difference between the salary a player is paid under the contract and the salary which a team would otherwise have to pay a player of comparable ability (the normal salary). For example, a player whose MRP was about $60,000 may only have a contractual salary of $30,000, while players with comparable ability would normally be expected to have a salary of $40,000. Thus, having that player's contract instead of another's would be worth $10,000 that year. Adding up the value of having that player's contract for each year the team expects to have the contract and then discounting that amount to take into account the time value of money would yield the value of the con-

tract when acquired. Thus, the contract of a player whose salary is the norm for players of comparable ability would be worth $0!

Dr. Noll performed a two-step regression analysis. The first step was to develop a "salary equation" which would predict the normal player salaries based on certain performance statistics. For pitchers, the performance statistics used were the lifetime ratio of strike outs to walks, the portion of a team's total innings pitched by the player, the changes in those ratios, the number of years in the major leagues, the pitcher's age, and a variable to take into account whether the pitcher averaged less than thirty innings pitched per year. For other players, the performance statistics used were the lifetime slugging average, the fraction of the team's total at bats accounted for by the player, changes in those statistics, the difference between the player's slugging average and the slugging average of players with the same batting average, variables to take into account whether the player plays infield, outfield, or both, and a variable to take into account whether the player averages less than forty at bats per year.

The second step of Dr. Noll's regression analysis was to develop a "transaction equation" which would predict the value of a player's contract (the player's transaction value) from certain player statistics, from the player's expected salary as estimated from the salary equation, and from the difference between the player's actual salary and the expected salary. The player statistics used were age, number of years in the major leagues, and the win-loss percentage of the acquiring team in the last five years. If the player was a hitter, the player's average at bats as a fraction of the team's total and the change in that statistic was also used. There was a variable to indicate whether a player was a pitcher, and if the player was a pitcher, the average innings pitched as a fraction of the team's total innings pitched and the change in that statistic was also used. Finally, there was a variable to indicate whether the data on a

player was suspected of being incomplete. Calculations were also done using the won-loss record of the selling team over the last five years.

The main source of data used by Dr. Noll came from a document dubbed the "Master Chron List," i.e., Master Chronological List. This is a chronological list of all transactions in the player market indicated by the transaction records of the American League from March 1964 through 1974, except for transactions within a particular major league team or involving certain options and recall transactions. The list attempts to indicate the player traded, the date of the trade, the assigning team, the receiving team, and the consideration received. The consideration received could be either cash, one or more players, or a combination of both.

The salary equations were estimated, using data on 235 players whose transactions were shown on the Master Chron List near the time of the Pilot's sale, and data on thirty-five of the forty-two players on the Pilot's major league roster for whom performance statistics were available. The equation generated could reproduce the salaries contained in the sample data with reasonable reliability.

The transaction equation was then generated using data from the Master Chron List on thirty-six transactions involving thirty-five different players (not the thirty-five Pilots). The thirty-six transactions all involved cash consideration. However, some transactions involved, or may have involved, other consideration; and some that looked like cash transactions were suspected of being otherwise. These transactions were labeled "unclean."

The transaction equation generated was then used to predict the contract values for the thirty-five players on the Pilot's major league roster for whom performance statistics were available. These estimates were totaled to give an expected roster value of approximately $1 million. Dr. Noll testified that one could be 98% confident that the true value of the acquired roster of thirty-five players was between $.5 and $1.5 mil-

lion. Dr. Robert Nathan, for the taxpayer, later testified that Dr. Noll incorrectly determined this range, and that when the correct confidence interval for prediction purposes is used, the 98% confidence level extends from negative $1.3 million to positive $3.3 million. I decline to resolve this dispute between Drs. Noll and Nathan. Dr. Noll made no effort to evaluate the minor league contracts but guessed that they would be worth less than $1 million. He observed that if they were equal in value to the major league players (i.e., thirty-five players equals $1 million), the remaining players would be valued at approximately $5 million, placing an upperbound value for the team at $6 million.

I find that the player roster value arrived at through this regression analysis is unreliable for the following reasons. First, the transaction equation was generated by using transactions observed in the player market, and then this equation was used to predict transaction values in a totally different market, i.e., the club market. The relevant market is the club market in which the bundle of assets was purchased. The club market is the market in which the price is determined primarily by free market forces. The transactions used to generate the transaction equation occurred in the player market, one highly controlled by the rules of the American League. Prices for players obtained on waiver or through the Rule 5 draft were fixed. While the transaction equation may predict the price for which a player will move in the player market subject to the rules of the American League, it would not predict the price for which that player would move as a member of a roster in the club market or in a free market.

Second, and related to the first reason, is that Dr. Noll erroneously attributes the amount by which the player reserve system had depressed the salary levels of the Pilots to the value of the franchise. To the Brewers, the value of participating in the reserve system, which is an attribute of having the franchise, is that in the future they could acquire player contracts that committed

players to play for depressed salaries. However, the Brewers did not acquire the contracts of the Pilots through participation in the reserve system; they acquired them through the club market. The Pilot's contracts also committed the players to play for depressed salaries, but this resulted from the Pilot's participation in the reserve system, not the Brewers'. Even if the Brewers had not acquired a right to participate in the reserve system, the player contracts they acquired from Seattle would still have provided for depressed salaries. In a free market such as the club market, a buyer such as the Brewers would be willing to purchase a player's contract for an amount equal to the present value of the annual difference between the player's MRP`and the salary provided for in the contract. The existence of this difference, not the initial reason for it, is what determines the value of the contract. Dr. Noll estimated that the depression of the Brewers' player salaries caused by the player reserve system was worth approximately $3 million.

Third, Dr. Noll assumed that the observed sample, i.e., players transacted in the player market, was representative of the population for which prediction was desired, i.e., the thirty-five major league players from the Pilot's roster. Excepting the data on the thirty-five Pilots, Dr. Noll had contract cost data only on those players who had been transacted in the player market, one governed by the rules of the American League. Testimony was unanimous that higher quality players are rarely transacted for cash in the player market. Dr. Noll assumed that the thirty-five Pilots evaluated were comparable to the players in the sample merely by comparing the player statistics of the thirty-five Pilots to the statistics of the players used in the sample. Yet there is nothing to indicate that a transaction equation derived from statistics on players who were transacted in the player market has any ability to predict the contract values of players who were never transacted in that market but who have similar performance statistics. The purchase of the Pilots was not a transaction

similar to the transactions that constituted the sample observations because it occurred in the club market, and the thirty-five Pilots evaluated were not necessarily players who had been transacted in the player market subject to American League rules.

Fourth, the data base used by Dr. Noll was not reliable. The Master Chron List attempted to summarize the American League transaction records. Both parties at trial agreed that it lacked much information about the true substance of the transactions. To overcome the shortcomings of the American League records, the United States compared the list to transactions recorded in the Baseball Guide and the Baseball Register, and noted whether those references indicated that the transaction was somehow different than shown on the list. The United States finally referred to certain depositions of persons who had been affiliated with teams involved in transactions to attempt to verify the transactions as recorded.

Despite these efforts, the United States failed to develop a clean data base. Dr. Noll admitted that the data provided to him was not what he had wanted. The list was utterly confusing. Nowhere on the list were the verification codes used by the law clerk who put together the list defined. Furthermore, the corrected and verified Master Chron List still contained many inaccuracies, even in the thirty-six transactions that Dr. Noll used to develop his transactions equation. In fact, the list was still being corrected during the trial. While the errors created by these inaccuracies may not have led to a significantly different transaction equation, the inaccuracies are one more factor that suggests Dr. Noll's results are unreliable.

Fifth, the transaction equation generated has poor reliability. As testified to by Dr. Nathan, the $R^2$ statistic, which measures the extent to which the equation developed explains the variations in the dependent variable (the contract value), indicates that the transaction equation is not reliable. The adjusted $R^2$ statistic, which is the same as the $R^2$ statistic but which takes into

account the sample size as well as the number of variables, indicates even less reliability. Dr. Nathan testified that thirty-six observations are very few when deriving an equation involving twelve variables. Further, many of the observations used were determined to be "unclean."

A final reason for rejecting Dr. Noll's regression analysis is that the "normal" salary as described in his theoretical model is not actually predicted by his salary equations. Dr. Noll testified that the salary equation predicts the average salary of a player with certain playing characteristics. This average salary, he indicated, would actually be somewhere between the theoretical normal salary and the actual salary of a player because players with salaries above the normal salary would be cut and would not be observed. This deviation between the average salary predicted by the salary equations and the theoretical normal salary would result in an error on the side of underestimating the contract values. Further, Dr. Noll's salary equation uses only certain objective player statistics to predict the average salary and does not take into account subjective factors as a team's owner would in determining whether two players are comparable. Thus, the salary equation would be a poor predictor of the normal salary for a player of "comparable ability."

### 2. Income Sensitivity Analysis

Dr. Noll's income sensitivity analysis is also unpersuasive. The premise of this analysis is that one reasonable way to allocate the price among the assets in the bundle of assets purchased is to determine how sensitive revenues are to marginal changes in the various assets. Using the revenues projected by the financial forecasts done for the Brewers, which were unreliable, Dr. Noll estimated that approximately one-third of the revenues are sensitive to the quality of the team playing. Therefore, he would allocate one-third of the purchase price to the player contracts.

Dr. Noll's income sensitivity analysis is a less reliable method of evaluating the player contracts than the plaintiff's method of obtaining appraisals. The analysis looks only at the marginal impact of team quality, and it ignores the question of whether there is some baseline value for a team of minimum quality. Nonetheless, such a minimum quality team is as necessary to generating any revenue as is the franchise. As Dr. Noll testified, allocating the purchase price to parts of the team requires arbitrariness, and Dr. Noll's income sensitivity analysis may be a reasonable way of making that arbitrary allocation, but it bears no necessary relationship to the fair market value of the player contracts when they were purchased from Seattle in the club market.

### C. Government Appraisals

The United States also tried to prove that the player contracts were not worth the $10.2 million by producing two appraisals by other experts in baseball. The first appraisal was performed by Dewey Soriano who was a very interesting fellow. He is an old baseball player who is now a pilot on ships on the West Coast. He has maintained his interest in baseball throughout his lifetime. He estimated that the player contracts were worth no more than $3.2 million. This appraisal, unlike those relied upon by the plaintiff, was made twelve years after the fact and is based primarily on memory. The appraised value is significantly smaller than the value that he used for insurance purposes when he was president of the Seattle club, and, of course, this appraisal is inconsistent with his representations when he was selling the club to Milwaukee. Selig, Fitzgerald, and Donnelly all testified that during the negotiations, Dewey Soriano emphasized the value of his players. It is unlikely that his appraisals are reliable.

The second expert appraisal performed on behalf of the United States was made by Richard Walsh. Walsh's appraisal had almost no relationship to the club market and was based mainly on player market transactions. Walsh was the general manager of the California Angels from 1968 to the fall

of 1971. Walsh appraised the roster at a low of $3,257,600 and a high of $5,102,600. Walsh made no effort to determine the market value for the contracts of certain players and instead simply valued them on the basis of the bonus they had received when they were signed as rookies or the amount that the Pilots paid for their contract in the player market. Thus, in the 35-man major league roster transferred from the Pilots to the Brewers, Walsh placed nominal values on players Kimball, Howard, and Parsons. He acknowledged that the Kimball contract had a fair market value of $75,000, the Howard contract had a fair market value of $25,000, and the Parsons contract had a fair market value of between $75,000 and $100,000. Thus, it would appear that between $175,000 and $200,000, at minimum, should be added to both the high and low end of Walsh's range. Furthermore, Walsh testified that a buyer might pay a premium to obtain an entire roster of players, but he did not estimate the value of this premium.

In his appraisal of the minor league players, Walsh, for the most part, made no attempt to determine the fair market value of players on the minor league roster when the players had less than three years experience. He failed to assess how a player's potential would affect his fair market value in any market. His appraisal was made in October of 1982, more than twelve years after the sale of the roster to the Brewers and eleven years after his last official connection with the baseball industry. He remembered some characteristics of some of the players, but much of his appraisal was based upon reading their statistics. He had a limited knowledge of the difference between evaluating players contracts when selling a ballclub in the club market and when selling individual players in the player market with all of its constraints. I cannot give his testimony much weight.

### D. Comparison of Contract Values to Salaries

The Government's final analysis compared the relative contract price and salary level of the Brewers' contracts to the relative contract price and salary level of other American League contracts. This was done by computing the ratio of the contract price to the salary provided in the contract, and by examining the dollar difference between the contract price and the salary provided. These ratios and differences were higher for the Brewers' contracts than for other contracts. From this the Government urges the Court to conclude that the Brewers' contracts were overvalued.

This is a nonsequitor. Again the Government failed to distinguish between the player market and the club market. The American League contract prices were player market transaction prices taken from the Master Chron List. The problems with this data have already been considered in the discussion of Dr. Noll's regression analysis.

## CONCLUSION

In conclusion I find that:

1. This court has jurisdiction over the parties and the subject matter of the action.

■ 2. A reasonable allowance for the amortization of the player contracts of the Brewers, which were used in the business of a professional baseball club, is allowed as a depreciation deduction under § 167(a) of the Internal Revenue Code of 1954, as amended.

■ 3. Baseball contracts are intangible assets which are known from experience to be of use for only a limited period, the length of which can be determined with reasonable accuracy, and thus the cost of acquiring baseball contracts may be depreciated over their useful lives per § 1.167(a)–3 of the Income Tax Regulations.

■ 4. The costs of acquiring personal service contracts of professional athletes with a separate and distinct value may be depreciated over an ascertainable useful life. *Laird v. United States,* 556 F.2d 1224 (5th Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978); *KFOX, Inc. v. United States,* 510 F.2d 1365, 206 Ct.Cl. 143 (Ct.Cl.1975); *First Northwest In-*

*dustries of America, Inc. v. Commissioner,* 70 T.C. 817 (1978), *rev'd and remanded on other grounds,* 649 F.2d 707 (9th Cir.1981); Rev.Rul. 67–379, 1967–2 C.B. 127.

5. The Milwaukee Brewers Baseball Club was entitled to amortize player contracts purchased from Pacific Northwest Sports, Inc., over their useful lives.

■ 6. The "useful life" of a baseball contract is a reasonable estimate of the period over which it may be expected to be useful to the club in the light of the professional experience in baseball. 26 C.F.R. § 1.167(a)–1(b) (1982).

■ 7. In the taxable purchase of the assets of a business, the purchase price is generally allocated first to cash and cash equivalents at their face values and then to the remaining tangible and identifiable intangible assets in proportion to their relative fair market values. *See Victor Meat Co.,* 52 T.C. 929 (1969).

■ 8. Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. *Commissioner v. Marshman,* 279 F.2d 27, 32 (6th Cir.1960). The fair market value to be determined is that in the market in which the property was acquired.

■ 9. In an arm's length sale of assets, an explicit contractual allocation of the purchase price will usually be accepted for tax purposes where the allocation was subjected to bargaining, absent fraud, collusion, or an allocation so disproportionate as to be unreasonable. *Commissioner v. Patino,* 186 F.2d 962, 967 (4th Cir.1950); *212 Corp. v. Commissioner,* 70 T.C. 788, 800 (1978). In this case the plaintiff has not shown that the allocation set forth in the contract was negotiated and, therefore, the allocation carries no weight. *See KFOX, Inc.,* 510 F.2d at 1370.

■ 10. The taxpayer has introduced substantial evidence in support of his position and has established the wrongfulness of the Government's position; therefore,

any presumption in favor of the Government's determination disappeared, and this decision is based upon the preponderance of all credible evidence in this case. *KFOX, Inc.,* 510 F.2d at 1369.

11. The evidence here indicates that the allocation of $10.2 million to the player contracts acquired by the Brewers from the Pilots was a reasonable allocation, and that the appraisals performed for the Brewers provide a more reliable estimate of what the cost of the acquired player contracts would be in the market in which they were purchased, i.e., the club market, one unincumbered by the American League rules, than do the United States' appraisals or analyses.

12. The Milwaukee Brewers Baseball Club properly allocated $10.2 million to player contracts and $500,000 to the franchise as reasonable determinations of the fair market value of those assets. The allocation stated in the contract is reasonable because it is supported by appraisals which were in accord with it. Appraisals are a reasonable means of determining fair market value.

13. Adjustments made to plaintiff's federal income tax returns by the Internal Revenue Service for the years 1967 and 1968 and for 1970 through 1976 are improper.

14. Plaintiff has overpaid his federal income taxes for the years 1967 and 1968 and for 1970 through 1976 in the following amounts:

| | |
|---|---|
| 1967 | $10,306.86 |
| 1968 | $ 2,476.35 |
| 1970 | $   195.80 |
| 1971 | $33,973.18 |
| 1972 | $ 4,482.57 |
| 1973 | $21,170.76 |
| 1974 | $29,124.40 |
| 1975 | $35,210.43 |
| 1976 | $ 6,218.43; and |

plaintiff is further entitled to a refund of $8,450 for overpayment of federal income taxes for 1975.

15. Plaintiff is entitled to judgment in his favor in the amount of $151,608.78 plus statutory interest and his costs and disbursements as allowed by law.

APPENDIX I–1

EXHIBIT

PLAINTIFF'S
111A
No 81–C–334

Milwaukee Brewers Baseball Club
Financial Highlights
For Fiscal Years Ending 10/31 (000's omitted)

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| | 1970 (7 months) | 1971 | 1972 | 1973 | 1974 | 1975 |
| Operating Revenue | | | | | | |
| Admissions (note 1) | 2247 | 1926 | 1778 | 2830 | 2862 | 3792 |
| Concessions | 362 | 302 | 264 | 577 | 557 | 797 |
| Radio & TV (note 2) | 600 | 600 | 1269 | 1319 | 1327 | 1151 |
| Publications (Advertising) | 22 | 38 | 33 | 33 | 55 | 61 |
| Ushering Service | — | — | 65 | 121 | 132 | 160 |
| All-Star Game | — | — | — | — | — | 177 |
| Miscellaneous (note 3) | 5 | 12 | 37 | 27 | 49 | 71 |
| Total Operating Revenue | 3236 | 2878 | 3446 | 4907 | 4982 | 6209 |
| | | | | | | |
| Operating Expenses | | | | | | |
| Major League Team | 1104 | 1108 | 1061 | 1175 | 1390 | 1640 |
| Player Development | | | | | | |
| & Scouting | 764 | 862 | 922 | 920 | 865 | 878 |
| Spring Training | 79 | 240 | 241 | 184 | 192 | 204 |
| Amortization of | | | | | | |
| Player Contracts | 1128 | 1647 | 1387 | 1269 | 1161 | 556 |
| Loss on Players | | | | | | |
| Released or Sold | 961 | 1649 | 728 | 307 | 177 | 5 |
| | | | | | | |
| Major League Central Fund | 297 | 277 | 320 | 346 | 341 | 367 |
| | | | | | | |
| Park Operation | | | | | | |
| Publicity and Promotion | | | | | | |
| Ticket Department | 985 | 1049 | 1171 | 1469 | 1298 | 1498 |
| General and Administrative | | | | | | |
| Ushering Service | | | | | | |
| All-Star Game | | | — | — | — | 65 |
| Miscellaneous (note 4) | | | — | — | — | 15 |
| Total Operating Expenses | 5318 | 6832 | 5830 | 5670 | 5424 | 5228 |
| | | | | | | |
| Operating Income (Loss) | (2082) | (3954) | (2384) | (763) | (442) | 981 |
| | | | | | | |
| Non Operating Income (Expense) | | | | | | |
| Interest, Net | (234) | (477) | (467) | (545) | (509) | (446) |
| Disposition of Equipment | (31) | | | | | — |
| | | | | | | |
| Extraordinary Charge | | — | (205) | — | | — |
| | | | | | | |
| | (265) | (477) | (672) | (545) | (509) | (446) |
| | | | | | | |
| | | | | | | |
| Net Income (Loss) | (2347) | (4431) | (3056) | (1308) | (951) | 535 |
| Less Amortization and Loss | | | | | | |
| on Players Released & Sold | 2089 | 3296 | 2115 | 1576 | 1338 | |
| | (258) | (1135) | (941) | 268 | 387 | |

(1,679,000) = Total Loss Before Amortization and Loss on Player Contracts

Miscellaneous Data:

| | | | | | | |
|---|---|---|---|---|---|---|
| Capital Contributions | 5000000 | 1000000 | 171065 | 2037369 | 200000 | -0- |

SOURCE: PMM Audited F/S

| | | | | | | |
|---|---|---|---|---|---|---|
| Home Attendance | 933690 | 731531 | 600440 | 1092158 | 955741 | 1213357 |

SOURCE: 1973–76 Brewers Media Guides; 1970–71 PMM Report on Statement of Receipts and Attendance by visiting clubs

| | | | | | | |
|---|---|---|---|---|---|---|
| Won–Lost Record | 65–97 | 69–92 | 65–91 | 74–88 | 76–86 | 68–94 |

SOURCE: 1975–76 Brewers Media Guides

## APPENDIX I–2

### MILWAUKEE BREWERS BASEBALL CLUB

#### Notes To Financial Highlights

(1) Total consists of net home game revenue, away game shares, and net ticket revenues from spring training and exhibition games.

(2) This amount shows gross revenues from the Central Fund Radio/TV operations plus Local Radio/TV net revenues. Central Fund expenses are shown separately under Operating Expenses.

The following related supplemental data is provided:

|  | Net Local Radio/TV* | Net Central Fund (i.e., Cash Received) |
|---|---|---|
| 1970 | $600,000 | N/A |
| 1971 | 600,000 | N/A |
| 1972 | 600,000 | $370,000 |
| 1973 | 600,000 | 390,000 |
| 1974 | 600,000 | 413,000 |
| 1975 | 414,000 | 395,000 |

*Amount included as part of Radio & TV operating revenue on the Highlights Schedule.

(3) Includes novelty item sales.

(4) Includes novelty cost of sales.

## APPENDIX II

UNITED STATES DISTRICT COURT

EASTERN DIST. OF WISCONSIN

Case No. 81-C-334
Exh. No. 480
Date Rec'd 11-23-82
Deputy Clerk DDB

### AMERICAN LEAGUE CLUB SALES 1965–1980

| Club Name | Year of Sale | Seller | Purchaser | Approximate Sales Price | Purchaser Business Form |
|---|---|---|---|---|---|
| Cleveland Indians | 1966 | Cleveland Indians, Inc. (William R. Daley) | Cleveland Indians, Inc. (Vernon Stouffer) | $ 8,000,000 | Corporation |
| Seattle Pilots | 1967 | Expansion Club | Pacific Northwest Sports, Inc. | $ 6,000,000 | Corporation |
| Kansas City Royals | 1967 | Expansion Club | K.C. Royals Baseball Corp. | $ 6,000,000 | Sub–Chapter S Corp. |
| Washington Senators | 1969 | The Senators, Inc. | Washington Senators, Inc. | $ 9,000,000 | Corporation |
| Milwaukee Brewers | 1970 | Pacific Northwest Sports, Inc. (Seattle Pilots) | Milwaukee Brewers Baseball Club | $10,800,000 | Limited Partnership |
| Cleveland Indians | 1972 | Cleveland Indians, Inc. (Vernon Stouffer) | Cleveland Indians Co. (Nick J. Mileti) | $ 9,000,000 | Limited Partnership |
| New York Yankees | 1973 | CBS Broadcasting | New York Yankees | $10,000,000 | Limited Partnership |
| Texas Rangers | 1974 | Texas Rangers, Inc. | The Texas Rangers, Ltd. | $ 9,000,000 | Limited Partnership |
| Chicago White Sox | 1975 | John Allyn | Chicago White Sox, Inc. | $ 9,000,000 | Corporation |
| Toronto Blue Jays | 1976 | Expansion Club | Metro Baseball Company | $ 7,000,000 | Limited Partnership |
| Seattle Mariners | 1976 | Expansion Club | Seattle Baseball Club | $ 6,325,000 | General Partnership |
| Boston Red Sox | 1978 | Estate of Thomas A. Yawkey | Boston Red Sox Baseball Club | $18,500,000 | Limited Partnership |
| Baltimore Orioles | 1979 | Baltimore Baseball Club, Inc. | EBW, Inc. | $12,000,000 | Corporation |
| Oakland Athletics | 1980 | Charles O. Finley & Company | The Oakland Athletics Corp. | $12,700,000 | Corporation |

Sales prices as listed are approximate and are not comparable since there are variations in the assets sold, e.g. sometimes real property is included and sometimes not; sometimes cash is included and sometimes not, etc.; also in the case of sales of stock sometimes less than 100% was sold.

The American League office has no information with respect to allocations of purchase prices made by either the sellers or the purchasers.

Source of data: 1965–1974 Official Baseball Guide published by The Sporting News, Baseball Blue Book
1975–1980 American League office records